Michael E. WILEY, et al.,
Plaintiffs-Appellees,

v.

OFFSHORE PAINTING CONTRACTORS, INC., Defendant-Appellee,

v.

CHEVRON U.S.A., INC.,
Defendant-Appellant.

CHEVRON U.S.A., INC., Third Party Plaintiff-Appellant,

v.

The CONTINENTAL INSURANCE COMPANY and St. Paul Fire & Marine Insurance Co., Third Party Defendants-Appellees.

In the Matter of the Complaint of OFFSHORE PAINTING CONTRACTORS, INC. As Owner of the M/V SANDRA P, For Exoneration From or Limitation of Liability, Petitioner-Appellee,

v.

CHEVRON U.S.A., INC.,
Claimant-Appellant.

B.R. HERRINGTON ENTERPRISES, INC. and First State Insurance Company, Plaintiffs-Appellees,

v.

OFFSHORE PAINTING CONTRACTORS, INC., Defendant-Appellee,

v.

CHEVRON U.S.A., INC.,
Defendant-Appellant,

v.

The CONTINENTAL INSURANCE COMPANY and St. Paul Fire & Marine Insurance Company, Third Party Defendants-Appellees.

Nos. 81–3468, 81–3469 and 81–3470.

United States Court of Appeals,
Fifth Circuit.

July 25, 1983.

---

McLoughlin, Barranger, Provosty & Melancon, Lloyd C. Melancon, New Orleans, La., for Chevron.

Michael X. St. Martin, Houma, La., for Wiley.

Edgar F. Barnett, Lake Charles, La., for Offshore.

Philip E. Henderson, Houma, La., for Uninsured Interest of Offshore.

David R. Normann, New Orleans, La., for Continental.

Mat M. Gray, III, New Orleans, La., for St. Paul Fire & Marine.

J. Wendel Fusilier, Ville Platte, La., for Fontenot.

Frank E. Lamothe, III, New Orleans, La., for Windham.

Before RANDALL and HIGGINBOT-HAM, Circuit Judges, and BUCHMEYER *, District Judge.

BUCHMEYER, District Judge:

This is a personal injury case involving a seaman and two painters who were severely injured when an explosion occurred at an offshore oil and gas production platform owned by Chevron U.S.A. Inc. ("Chevron").

Chevron appeals from judgments awarding substantial damages (over $3 million) to these three individuals. It raises these issues: that the trial court abused its discretion in denying Chevron's motion for continuance because one of the plaintiffs, David Fontenot, was not present at the trial; and, that the trial court erred in refusing to grant Chevron indemnity or, in the alternative, contribution from the employer of the three individuals, Offshore Painting Contractors, Inc. ("Offshore Painting") because of the alleged negligence of Offshore Painting and because of an indemnity provision in the written agreement between Offshore and Chevron.

In addition, Chevron appeals from a judgment awarding $160,000 in damages to Continental Insurance Company ("Continental") as reimbursement for the payment by Continental for the loss of Offshore's paint boat which was destroyed by the explosion. Here, Chevron argues that the trial court erred because the insurance policies which were issued by Continental to Offshore Painting—and under which this amount was paid—named Chevron as an additional assured and waived all rights of subrogation against Chevron.

* District Judge of the Northern District of Texas, sitting by designation.

■ The issues raised by Chevron are without merit. Indeed, two of them are frivolous because they were never presented to the trial court. We affirm.

### Facts and Procedural History

Chevron contracted for Offshore Painting to perform sandblasting and painting work on a number of permanent offshore platforms which were owned and operated by Chevron in the production of oil and gas off the coast of Louisiana.[1] One of the two vessels which Offshore Painting used to transport its employees and their equipment to these offshore platforms was a three-year old paint boat, the M/V SANDRA P.

On June 14, 1978, the day of the explosion, the SANDRA P arrived at Chevron's Platform 181–A with a painting crew to continue work which had been in progress for several days.[2] Bobby Windham was the foreman of this painting crew. David Fontenot was a painter in the crew. Michael Wiley, a seaman, was the unlicensed "master" or "captain" of the SANDRA P; this was his first trip to Platform 181–A, which was some twenty miles offshore.

Wiley moored the SANDRA P at the boat dock on the south side of the production platform. Although there were other boat docks on the east and west sides, Wiley chose this one because of the direction of the wind and seas and because the air lines used by the painting crew from the previous day were already hanging off the platform by the south boat dock.[3] After the SANDRA P docked, Windham and Fontenot went aboard the platform to begin work, while Wiley remained on the paint boat to go to sleep.

Fontenot started "spot painting" on top of a large tank, called a "high pressure bulk separator," which was close to the boat dock on the south side of the platform. Attached to this bulk separator was a pressure relief valve which was set so that the contents of the tank would be discharged if the pressure in the bulk separator became too high or too low. The discharge line from the bulk separator ran to the south side of the platform, then made a 90° turn directly downward, so that the end of the discharge line was approximately forty-four feet above the south boat dock (and the SANDRA P).

About noon, the pressure relief valve suddenly broke—there was a loud noise, described by various witnesses as sounding like "a pop-off valve going off," followed by a "rushing noise"—and the gas and other contents of the bulk separator tank were released through the discharge line. The gas was immediately ignited by some unknown source,[4] and the explosion caused a fire which covered the entire south side of the platform. The SANDRA P was also engulfed in flames.

Fontenot fell to the platform deck from the top of the bulk separator tank; Windham slipped and fell to the deck from the catwalk; both were able to escape the fire by jumping from the platform into the water. Wiley awoke to find the SANDRA P in flames but, finally, he was able to run through the fire and dive into the water.

---

1. The "master services agreement" was executed February 9, 1977. It provided that Offshore Painting would perform this work "as an independent contractor" and as requested "from time to time" by Chevron.

2. On May 31, 1978, pursuant to the master agreement, Chevron issued a Service Order to Offshore Painting for a paint boat and crew and all materials necessary to "touch-up paint" the compressor piping on Platform A in the West Cameron Block 181 ("Platform 181–A").

3. The compressor for these air lines, which were used to operate paint guns and sandblasters, was located on the SANDRA P.

4. At trial, Chevron claimed the ignition was caused by something (perhaps the stove or electrical system) on the SANDRA P, which its attorney described to the jury as a "bucket of rust." Offshore Painting claimed the source of the ignition was something (perhaps the freezer or the air conditioner) on Chevron's platform. There was no *direct* resolution of this conflict—either by the jury in the trial of the individual claims or by the trial court in its Findings of Fact and Conclusions of Law concerning the issues of indemnity and contribution, exoneration and limitation of liability.

All three were later rescued by workers on the platform, but each was seriously injured: Wiley suffered burns on 90% of his body; Windham had severe spinal injuries; and Fontenot fractured vertebra in his neck and spine.[5] The SANDRA P was almost totally destroyed.

Wiley filed suit against both Chevron and Offshore Painting, as did Windham. Fontenot filed suit only against Chevron. The claims in the three actions were based upon negligence and strict liability under state law, Articles 2315, 2317 and 2322 of the Louisiana Civil Code, and upon the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq.[6] By various motions filed in these suits—and by three other lawsuits: one filed by Offshore Painting, one filed by Continental Insurance, and one filed by B.F. Herrington Enterprises ("Herrington")—these additional claims were made:

(i) Chevron and Offshore Painting sought recovery from each other for indemnity or, in the alternative, for contribution;

(ii) Offshore Painting sought "exoneration from and limitation of liability" as owner of the vessel SANDRA P;

(iii) Chevron sought recovery from Continental on the marine hull and marine P & I insurance policies issued to Offshore Painting—which covered the SANDRA P and which named Chevron as an additional assured;[7]

(iv) Continental sought recovery from Chevron for the amounts it had paid, under the insurance policies issued to Off-

shore Painting, for the loss of the SANDRA P ($160,000) and for the "maintenance and cure" of the plaintiff Wiley ($70,366.19); and

(v) Herrington, the owner of the compressor and other equipment on the SANDRA P, sought recovery from Chevron or Offshore Painting for the loss of these items.[8]

In other words, this was "another one of those seagoing donnybrooks in which all generously claim that someone else must bear the burden of amounts paid to a seaman [and two painters] for injuries sustained during a typical off-shore drilling operation in Louisiana shelf waters." *Lanasse v. Travelers Ins. Co.,* 450 F.2d 580, 581 (5th Cir.1971).

These six cases were consolidated for trial. The claims of the three individuals (Wiley, Windham, Fontenot) were submitted to a jury. The remaining issues, including indemnity and contribution, were reserved for decision by the trial court.

Chevron contended at trial—just as it does on appeal—that Michael Wiley was negligent in docking the SANDRA P downwind on the south end of the platform, "directly below the gas discharge lines" from the bulk separator tank, while carrying "a highly inflammable cargo" of paints and solvents. In response, the plaintiffs (and Offshore Painting) presented evidence that Wiley was not negligent: that he chose the south boat dock because of the wind and sea direction and because the air lines were already there; that there was no warning sign at this dock; that Chevron

---

**5.** Fontenot also claimed the incident caused him severe "mental" problems because "he had been burned very bad when he was twelve." Fontenot was later committed to a mental institution for a period of time.

**6.** Jurisdiction was based upon the Jones Act, 46 U.S.C. § 688; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331; the general maritime law of the United States; and diversity under 28 U.S.C. § 1332.

**7.** St. Paul Fire & Marine Insurance Company, which provided "umbrella coverage" for Offshore Painting, was also sued by Chevron on these claims.

**8.** First State Insurance Company, the insurance carrier for Herrington, also joined as a plaintiff in this suit—which was settled before trial with Chevron and Offshore Painting agreeing to pay $22,000 "in the apportionment of their respective liabilities made by final judgment in the pending case of *Michael Wiley v. Chevron U.S.A. and Offshore Painting Contractors* and consolidated cases." Accordingly, the only matter in the Herrington case involved in this appeal is the issue of apportionment between Chevron and Offshore Painting.

employees used it "all the time"; and that Offshore's crews had used this dock without incident on prior occasions. In addition, they contended that the explosion was caused by Chevron's negligence because:

(i) A nut connecting the pressure relief valve was severely corroded. This caused it to break and release the gas through the discharge line. The explosion would not have happened if Chevron had used a stainless steel nut which would not corrode—indeed, certain Chevron documents indicated that stainless steel parts should have been used on the relief valve—or if Chevron had properly inspected and replaced the corroded nut;

(ii) The gas discharge lines from the bulk separator should not have been near the boat dock area, and certainly should not have had the 90° downward turn because this put the end of the discharge line directly above any vessels that were moored at the south dock. The explosion would not have occurred if the discharge line had been properly constructed—indeed, certain Chevron documents established that the 90° downward turn was a mistake—and no other Chevron platform had a discharge line constructed like this.

Chevron, in return, argued that the SANDRA P was unseaworthy and that Offshore Painting was negligent because its employees—particularly Fontenot, who was painting the bulk separator tank and the pressure relief valve—should have discovered any defective or corroded nut.

After a trial of almost two weeks (June 1–10, 1981), the jury resolved every issue against Chevron and in favor of the plaintiffs and Offshore Painting. Specifically, it found that (i) neither Wiley nor the other plaintiffs were negligent; (ii) Offshore Painting was not negligent; (iii) the SANDRA P was not unseaworthy; (iv) Chevron was negligent, the platform was defective, and this was the sole cause of the explosion; and (v) Chevron was liable to Wiley for $2,250,000, to Windham for $330,000, and to Fontenot for $500,000.

The trial court also resolved every issue against Chevron in its Findings of Fact and Conclusions of Law. Using the jury's findings as advisory, the court held that Chevron's negligence caused the explosion; that Offshore Painting was not negligent and the SANDRA P was not unseaworthy; that Chevron was not entitled to indemnity or contribution; and that Offshore Painting and the SANDRA P were entitled to exoneration from liability. Accordingly, on June 24, 1981, the trial court entered the judgments which occasioned this appeal.

### The Motion for Continuance

Chevron's first issue misrepresents the facts to this court.

Chevron states that it requested the trial court to grant a continuance because the absence of a supposed "key witness," the plaintiff David Fontenot, would prevent "Chevron from fairly presenting its case." This is not true. Chevron made no such request. To the contrary, Chevron objected to any testimony by Fontenot (except that presented through his deposition).

At the very beginning of the trial, Fontenot's attorney announced that his client had been "operated on [last] Thursday morning" and, according to a letter from the doctor, "will be in the hospital for four or five days." Chevron immediately moved for a continuance—but solely on the grounds that the jury might think that the injuries sustained by Fontenot in the explosion were so serious that they were preventing him from attending trial. Specifically, the Chevron attorney stated:

"I move to continue the trial on the grounds that this is a witness that has now gone into the hospital, the inference drawn by his not appearing and the testimony of the doctors who undoubtedly testify in his behalf will be highly prejudicial to this defendant. . . .

" . . .

" . . . It is submitted that this, as I understand it is an ulcer attention (sic) [9]

9. At trial, it was disputed whether or not the explosion caused Fontenot to have severe

"mental" problems and, if so, whether or not the elective ulcer surgery three days before

and surgery that here we have a case that is going to trial now and it's true the plaintiff's deposition has been recorded, but the inference to this Jury is this man is in the hospital based upon this particular condition and this incident and no question of that is going to be presented to the Jury. We would certainly object to the man coming into the Court four or five days after surgery with a fresh scar and all the problems that might be encountered with respect to surgery. It is highly prejudicial to Chevron...." [10]

The requested continuance was opposed by every other party in the six consolidated cases. The trial court denied Chevron's motion, but cautioned the jury that Fontenot's absence was unexpected—and that the jury would have to decide, under all of the evidence, whether "this present hospitalization [is] in any way or is not in any way connected with his original claim." Chevron made no objection to this instruction.[11]

At no time did Chevron request a continuance on the grounds that Fontenot was "a key witness in Chevron's case." [12] Chevron never advised the trial court that "Fontenot alone knew and could testify about the events leading up to the fracturing of the relief valve." Nor did Chevron ever contend, as it does on appeal, that Fontenot's deposition "did not deal sufficiently with these issues." [13] And, Chevron never made

any attempt during the two-week trial to subpoena Fontenot to testify—even though the attorney for Fontenot had indicated that his client should be released from the hospital by the second or third day of trial and that we "do plan to go ahead and try to bring him, if we have to, before the end of the trial."

Instead, contrary to Chevron's first issue on appeal its attorney told the trial court that Chevron objected to any live testimony by Fontenot during trial:

"... Your Honor, he did this upon his own, through his doctor, and he knew that this case was fixed for trial and had been fixed for trial for many, many months. He had this ulcer condition, as I understand had previous surgery with respect to the ulcer condition and to now bring this before the Jury and it is calculated to have no other effect than to prejudice, at least our position in this case and not only oppose the Court going forward with the trial at this time, *would further oppose the man making an appearance in this trial* in connection with surgery that has happened to him within four or five days of the trial. I think it is highly prejudicial, Your Honor. We so move the Court to continue this case." (Emphasis added.)

Therefore, Chevron's first issue on appeal is frivolous because it was never presented

---

trial was related to these problems. *See* footnote 5.

**10.** Chevron also complained that Fontenot had undergone surgery on the very day of the final pre-trial conference—contrary to the "understanding" at that time that everyone "was to be advised promptly" if surgery did take place—but the trial judge rejected this complaint, noting that he "didn't feel this was any message from the front."

**11.** Despite this, Chevron attempts to argue—for the first time on appeal—that "the trial judge's admonitions to the jury were not sufficient precautions against" the risk "that the jury would consider [Fontenot's] alleged injuries to be so severe as to prevent his attendance at trial." If this is intended to be an argument for reversal, this issue is not properly before us since it was not presented to the district court. *Shingleton v. Armor Velvet*

*Corp.,* 621 F.2d 180, 183 (5th Cir.1980); *Mayberry v. Davis,* 608 F.2d 1070, 1071–72 (5th Cir.1979).

**12.** Fontenot was not even listed as one of Chevron's witnesses in the Pre-Trial Order. In fact, Fontenot's attorney did not list his client as a witness; the plaintiff Wiley listed Fontenot only as a possible witness; and Offshore Painting listed Fontenot as a witness only for purposes of cross-examination.

**13.** Actually, Chevron's brief states that Fontenot "then testified [during his deposition] that while working on the pressure valve [on the bulk separator] he slipped and broke the valve." This statement is also false. The deposition contains no such testimony. Although this was pointed out in the brief of Offshore Painting, there was no correction—or even any attempted explanation—made in the reply brief filed by Chevron.

to the trial court. *Shingleton v. Armor Velvet Corp.*, 621 F.2d 180, 183 (5th Cir. 1980); *Mayberry v. Davis*, 608 F.2d 1070, 1071–72 (5th Cir.1979); *Martin Oil Co. v. Gulf Ins. Co.*, 605 F.2d 197, 199 (5th Cir. 1979).

■ In addition, under the circumstances of this case, it is clear that the trial court did not abuse its discretion in denying Chevron's motion for continuance: the three plaintiffs had suffered severe injuries; the case was almost three years old and a continuance may have delayed the trial for months, perhaps even a year; two of the plaintiffs were present at trial, while Fontenot's deposition had been taken about one year after the accident and was available for use at trial; if additional testimony from Fontenot was needed, any party could subpoena him (or take his deposition during a trial break); there would be additional expense of trial preparation and inconvenience to witnesses if the case were postponed; and, each of the other eight parties in the consolidated trials opposed Chevron's motion for continuance. *See Lopez v. Aransas County Independent School District*, 570 F.2d 541, 544 (5th Cir.1978); *Webb v. Dresser Industries*, 536 F.2d 603, 610 (5th 1976); *Roberts v. Williams*, 456 F.2d 819, 824–25 (5th Cir.1971), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971).

*Offshore's Alleged "Statutory Violation"*

Chevron's second issue is also being raised for the first time on appeal.

Chevron argues that it is entitled to indemnity or contribution because "Offshore Painting was negligent as a matter of law in failing to have a licensed pilot or mate aboard" the SANDRA P, in violation of 46 U.S.C. §§ 390, 404 and 405. According to Chevron, since the plaintiff Wiley did not have a license, it is presumed under "the

Pennsylvania Rule" that Offshore's statutory violation was "at least a contributing cause of the explosion"—and that the burden was upon Offshore Painting to prove that absence of a licensed pilot "could not have been a contributing cause of the disaster." *The E. Madison Hall*, 140 F.2d 589, 591 (4th Cir.1944); *Armstrong v. Chambers & Kennedy*, 340 F.Supp. 1220, 1246 (S.D. Tex.1972), rev'd on other grounds sub. nom. *In re Dearborn Marine Service, Inc.*, 499 F.2d 263 (5th Cir.1974).

■ This contention was never presented to the trial court. The so-called "Pennsylvania Rule" is not even mentioned in the Pre-Trial Order or in Chevron's motions for directed verdict or its post-trial motion for j.n.o.v. or new trial. There is no reference to Offshore's supposed "negligence as a matter of law" or its alleged statutory violation in the Pre-Trial Order or in Chevron's trial or post-trial motions.[14] It is obvious, therefore, that Chevron's second issue is not properly before this court since "matters raised for the first time on appeal will not be considered." *Shingleton v. Armor Velvet Corp.*, 621 F.2d 180, 183 (5th Cir.1980); *United States v. Silva*, 611 F.2d 78, 80 (5th Cir.1980).

■ In addition, even if this issue were properly before us, Chevron's arguments are totally without merit: there was no "statutory violation" by Offshore Painting because the statutes cited by Chevron—46 U.S.C. §§ 390, 404 and 405—were not applicable to the SANDRA P and did not require the plaintiff Wiley to have a license. By their very terms, section 390 applies only if the vessel is carrying "passengers" other than the crew and employees of the owner of the vessel; section 404 applies only to vessels carrying "passengers for hire"; and section 405 applies only to "tug boats, tow-

---

14. There is a single reference to 46 U.S.C. § 404 in the "Statement of Reasons" filed by Chevron in support of its motion for new trial. However, it appears (or, rather, is hidden) in an argument about the alleged negligence of plaintiffs Wiley, Windham and Fontenot—and there is no mention of "the Pennsylvania Rule" and no citation of the *E. Madison Hall* and Dear-

born opinions—so this isolated reference did not present the trial court with the claims Chevron now makes on appeal. *See Thezan v. Maritime Overseas Corp.*, 708 F.2d 175 (5th Cir.1983). *See also Flannery v. Carroll*, 676 F.2d 126 (5th Cir.1982) (claim not listed in pretrial order is waived).

ing boats and freight boats."[15] The SANDRA P was merely carrying the painting crew and equipment to Chevron's offshore production platform; it was not carrying "passengers" or "passengers for hire," nor was it a "freight boat." Obviously, not one of these statutes required Offshore Painting to have a "licensed pilot or mate" on the SANDRA P.[16]

### The Indemnity Provision

Chevron's third issue *was* presented to the trial court. However, it was also presented by Chevron to this court eight years ago in *Smith v. Chevron Oil Co.,* 517 F.2d 1154 (5th Cir.1975) and *Stephens v. Chevron Oil Co.,* 517 F.2d 1123 (5th Cir. 1975). We rejected Chevron's argument then; we do so again now.

■ Specifically, Chevron claims it is entitled to indemnity or, in the alternative, contribution under the "indemnity provision" in its agreement with Offshore Painting. However, this identical provision was involved in both *Smith* and *Stephens* —where Chevron's negligence was the sole cause of the accidents involved and where we held unequivocally that this indemnity provision "does not provide for indemnification for [Chevron's] own negligence in the clear and specific language required by Louisiana law" (517 F.2d at 1157). In the present case, both the jury and the trial

judge found that Chevron's negligence was the sole cause of the explosion. Therefore, Chevron is not entitled to indemnity or contribution from Offshore Painting. *Smith v. Chevron Oil Co.,* 517 F.2d at 1157; *Stephens v. Chevron Oil Co.,* 517 F.2d at 1125.[17]

Of course, just as it did in *Smith,* Chevron argues that the findings by the jury and by the trial court should be overturned because they are "clearly erroneous"[18]—and that, once this is done, Chevron would be entitled to recovery under the indemnity provision. To support this argument, Chevron simply ignores all of the unfavorable evidence presented at trial and concludes, based solely upon a review of the evidence favorable to Chevron, that both Wiley and Offshore Painting were negligent concerning the docking of the SANDRA P at the south end of the platform directly below the gas discharge lines.

■ Obviously, this approach is improper and Chevron's argument is frivolous. The findings of the trial court can be disturbed only if they are "clearly erroneous" under a review of *all* of the evidence. Fed. R.Civ.P. 52(a); *Verrett v. McDonough Marine Service,* 705 F.2d 1437 (5th Cir.1983). And, the findings of the jury can be set aside only if, "viewing the evidence *as a whole* and in the light most favorable to the [opposing] party," reasonable men could not

15. See *United States v. THE REEFER KING,* 90 F.Supp. 236 (W.D.Wash.1950).

16. In addition, as discussed in the next section of this opinion, both the jury and the trial judge found that the plaintiff Wiley was not negligent in docking the SANDRA P. Thus, even if "the Pennsylvania Rule" applied, the evidence established that the absence of a licensed pilot on the paint boat was not a contributing cause of the explosion.

17. Chevron was also unsuccessful before this court in attempting to obtain indemnity where its negligence was the sole cause of the accident, *Chevron Oil Co. v. E.D. Walton Constr. Co., Inc.,* 517 F.2d 1119, 1121 (5th Cir.1975); *Lanasse v. Travelers Ins. Co.,* 450 F.2d 580, 583–84 (5th Cir.1971), and where the accident was caused by the concurrent negligence of Chevron and its independent contractor, *Cole v. Chevron Chemical Co.,* 477 F.2d 361, 367–69 (5th Cir.1973). The contract provisions in-

volved in these decisions were similar, but not identical, to the indemnity provision in the present case.

18. Actually, Chevron's "Statement of Issues" in this appeal attack only the findings made by the trial court concerning "limitation of liability and exoneration" and "indemnity and contribution." There is no direct attack upon the findings made by the jury in the trial of the individual cases, although Chevron cavalierly asserts—once in its Original Brief (p. 26), three times in its Reply Brief (pp. 6, 9, 12)—that the jury's findings that Offshore Painting and Wiley were not at fault are "incorrect" and are "clearly erroneous." We are not favored by Chevron with any analysis of what the results would be if the findings of the trial court were set aside, but the unattacked findings of the jury were left intact.

arrive at the verdict that Chevron's negligence was the sole cause of the explosion. *Thezan v. Maritime Overseas Corp.,* 708 F.2d 175 (5th Cir.1983); *Crumpton v. Confederation Life Ins. Co.,* 672 F.2d 1248 (5th Cir.1982). It is clear that the evidence in this case—particularly the testimony which Chevron even avoids discussing—is sufficient to sustain the findings of the jury and of the trial court:

(i) that Wiley was not negligent in mooring the SANDRA P at the south boat dock; this was, after all, a boat dock and Chevron employees used it for their vessels "all the time"; Offshore's crews had used this dock without incident on prior occasions; Chevron had placed no "warning signs" at this location; and Wiley chose the south dock because of the wind and sea direction and because the air lines used by the previous paint crew were already there.

(ii) that the explosion at Platform 181–A was caused solely by Chevron's negligence (a) in using a nut on the pressure relief valve which was subject to corrosion, and in failing to inspect and replace this corroded nut, and (b) in constructing the gas discharge line so that it ended directly above any vessels moored at the boat dock on the south side of the platform.

Although these conclusions are easily reached, we must address an issue raised by the recent decision of *Hyde v. Chevron U.S.A. Inc.,* 697 F.2d 614 (5th Cir.1983).[19] Both *Smith* and *Stephens* relied upon cases—primarily *Cole v. Chevron Chemical Co.,* 477 F.2d 361, 367–69 (5th Cir.1973)—which held that, under Louisiana law, the "parties' clear and unequivocal intent to indemnify against damages caused solely by the indemnitee's own negligence must be expressly articulated by specific reference to 'negligence' " (477 F.2d at 368). *Hyde v. Chevron* holds that this *is not* a correct statement of the Louisiana law:

"Finally and importantly, as we read the workover agreement, the intent of the parties was that Pool, the drilling contractor in charge of operations on the platform, agreed to indemnify Chevron against any claims for injuries to Pool's employees. Before reaching this agreement we reviewed the federal and Louisiana cases involving indemnity agreements. We shall not go through the tedious review that we considered necessary in discussing contributory negligence as a defense to strict liability. We reached the same conclusion Judge Stagg reached in *Battig v. Hartford Accident and Indemnity Co.,* 482 F.Supp. 338 (W.D.La. 1977). After reviewing the authorities including, of course, *Cole v. Chevron Chemical Company,* 5 Cir.1973, 477 F.2d 361, Judge Stagg concluded:

*... Louisiana does not require a specific reference to negligent acts in order for an indemnity agreement or a release to cover claims based on negligent acts.* However, the intention of the parties, as inferred from the language of their agreement must clearly indicate an intention to include negligent acts without the indemnity agreement or the release." (697 F.2d at 633) (Emphasis added).[20]

This does not change our conclusions in this case. Here, the indemnity provision does not "clearly indicate" the intention of the parties that Chevron would be entitled to indemnity even though its negligence was the sole cause of the explosion. The complete provision reads:

"Contractor [Offshore Painting] agrees to defend and hold Company [Chevron]

---

**19.** *Hyde v. Chevron* was decided after the oral argument in this case. However, Chevron raised this issue (albeit only in its Reply Brief) by citing a case relied upon in *Hyde*—*Polozola v. Garlock, Inc.,* 376 So.2d 1009 (La.App. 1st Cir.1979), *cert. denied,* 379 So.2d 1103 (La. 1980)—as well as *Daigle v. Lang,* 377 So.2d 1384 (La.App. 4th Cir.1979), *cert. denied,* 381 So.2d 510 (La.1980).

**20.** Under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–43 (1976 & Supp. III, 1979), Louisiana law applies to the Chevron offshore platform involved in this case. *Hyde v. Chevron U.S.A., Inc.,* 697 F.2d at 618.

indemnified and harmless from and against any loss, expense, claim or demand for:

(a) Injury to or death of [Offshore's] employees or for damage to or loss of [Offshore's] property in any way arising out of or connected with the performance by [Offshore] of services hereunder; and

(b) Injury to, or death of, third persons or the employees of [Chevron] or for damage to or loss of property of [Chevron] or of third persons, in any way arising out of or connected with the performance by [Offshore] of services hereunder, *unless caused solely by the negligence of [Chevron]; provided that if such injury, death, damage or loss is caused by the joint or concurrent negligence of [Offshore] and [Chevron], each shall be liable for one-half of the loss, expense, claim, or demand resulting therefrom.*

[Chevron] shall have the right, at its option, to participate in the defense of any such suit without relieving [Offshore] of any obligation hereunder." (Emphasis added.)

Obviously, the intention of the parties is "clearly indicated" by the underscored language in *paragraph (b):* If the employees or property of Chevron (or a third party) are injured or damaged in an accident caused solely by Chevron's negligence, then Chevron is not entitled to indemnity from Offshore Painting; if the accident is caused "by the joint or concurrent negligence" of Chevron and Offshore Painting, then each is to be liable for one-half of the resulting damages; if the accident is caused solely by the negligence of Offshore Painting, then Chevron is entitled to full indemnity.

However, there is no such clear and unambiguous language in *paragraph (a)* —which is the provision involved in this case because it covers injuries to Offshore's employees (Wiley, Windham, Fontenot) and damages to Offshore's property (the SANDRA P). Chevron offers no explanation of why the specific language concerning "sole negligence" or "joint or concurrent negligence" was not used in both paragraphs. Nor can Chevron offer any reasonable explanation of why it would expect or "intend" the language of paragraph (a) to afford indemnity for Chevron's own negligence when this court had specifically held—some two years before the execution of the "master services agreement" between Chevron and Offshore Painting— that this identical language did not entitle Chevron to indemnity if the accident was caused solely by Chevron's negligence. *Smith v. Chevron Oil Co.,* 517 F.2d at 1157; *Stephens v. Chevron Oil Co.,* 517 F.2d at 1125.

Therefore, unlike the indemnity clause involved in *Hyde v. Chevron,* 697 F.2d at 633–34, the provision in this case is ambiguous because of the different wording used in the two paragraphs. Certainly, there is no "clear indication" that the parties intended that Chevron would be indemnified, under paragraph (a), even if its negligence was the sole cause of the injuries to Offshore's employees and the damage to its property.[21]

Finally, we also emphasize that the indemnity question in *Hyde v. Chevron* was quite different from the one in this case. There, as stressed throughout the opinion (697 F.2d at 632–35), *Chevron was not negligent.* Instead, the negligence of the offshore drilling contractor, Pool, was the sole cause of the faulty step on the platform which resulted in injury to Pool's employee (Hyde). Although Pool had "complete control of the drilling operations" and the offshore platform, Chevron had been held liable for the injuries to Pool's employee on a theory of strict liability—that "the injury was 'occasioned' by the 'ruin' of a 'build-

---

21. "As drafter of the contract, Chevron could have provided a clear indication that the parties intended the result it argues for now. Where there is an ambiguity creating at least two reasonable constructions, that construction will prevail which is least favorable to the party who prepared the instrument." *Chevron Oil Co. v. E.D. Walton Constr. Co., Inc.,* 517 F.2d 1119, 1122 (5th Cir.1975).

ing'" (the offshore drilling platform), in violation of article 2322 of the Louisiana Civic Code—and Chevron, in turn, was seeking indemnity from the party (Pool) whose negligence (i) was the sole cause of the accident and (ii) had rendered the platform a "ruin" under article 2322. The *Hyde* opinion reasons that "the basis for the general rule of not allowing a party to contract against his own negligence is not applicable to strict liability cases" (697 F.2d at 632), and holds:

> "... We have not been referred to any case, nor have we found any case, in which there is any discussion of the applicability of an indemnity clause to strict liability. The policies underlying strict liability argue for permitting indemnity agreements and we have no reason to assume that the principles of contractual construction would be different in a strict liability case.
>
> "...
>
> "We hold that the clear intention of parties was that Pool should indemnify Chevron against all claims of Pool's employees, including claims based on strict liability under article 2322 of the Louisiana Civil Code."

(697 F.2d at 633, 635.)

However, *Hyde v. Chevron* repeatedly emphasizes that "the record shows no evidence of any negligence on the part of Chevron and its [strict] liability is based solely on ownership of the platform" (697 F.2d at 633). Thus, *Hyde* was not confronted, as we are, with a claim by Chevron for indemnity from its own negligence—and *Hyde* does not overrule *Smith v. Chevron,* 517 F.2d at 1157; *Stephens v. Chevron,* 517 F.2d at 1125; or the other Fifth Circuit decisions (see footnote 17) which rejected Chevron's attempts to obtain indemnity where its negligence was the sole cause of the accident.

*The Loss of the SANDRA P*

Chevron's last issue is properly before this court, and it is not frivolous—but this issue involves only the judgment in favor of Continental Insurance for the $160,000 it paid to Offshore Painting for the loss of the SANDRA P.[22]

Under its agreement with Chevron, Offshore Painting obtained a marine hull insurance policy covering the SANDRA P, along with worker's compensation, employee's liability, and marine P & I policies.[23] These policies were issued by Continental; both the marine hull and the marine P & I policies contained identical form provisions naming Chevron as an additional assured, and waiving all rights of subrogation against Chevron, but only with regard to vessels "that may be employed by or actually working for" Chevron.

Chevron first cites cases holding that an insurer cannot recover against its own assured, even as a subrogee against an "additional assured," particularly when the policy contains a specific waiver of subrogation against the additional assured. *Tidewater Equipment Co. v. Reliance Ins. Co.,* 650 F.2d 503 (4th Cir.1981); *Continental Oil Co. v. Bonanza Corp.,* 511 F.Supp. 62 (S.D.Tex. 1980). Then, based upon dicta in *Lanasse v. Travelers Ins. Co.,* 450 F.2d 580, 584–85 (5th Cir.1971), *cert. denied sub nom. Chevron Oil Co. v. Royal Ins. Co.,* 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972), Chevron argues that—even though Chevron's negligence in constructing and operating the production platform was the sole cause of the explosion (and the destruction of the SANDRA P)—Continental is precluded from any recovery against it because the marine hull policy named Chevron as an additional assured and waived subrogation rights against it.

█ This argument, too, is baseless. By being named as an additional assured on

---

**22.** Although its briefs are not clear, apparently Chevron also intends to appeal from the judgment awarding $70,366.19 to Continental for the "maintenance and cure" paid to Wiley under another insurance policy issued to Offshore Painting. If so, the appeal would be based not upon this last issue—but, instead, upon the

grounds asserted in Chevron's first three issues (which are without merit).

**23.** A marine P & I ("Protection and Indemnity") policy covers liabilities for loss, damage or expense incident to the ownership, operation or use of a vessel.

the marine hull and P & I policies, Chevron was protected from any liability arising from the operation of the SANDRA P *to the same extent as Offshore Painting.* However, neither the hull nor the P & I policy afforded any insurance coverage to Chevron because of its actions as the owner and operator of the offshore production platform. Therefore, the provisions in these policies naming Chevron as an additional assured and waiving subrogation simply do not pertain to Chevron's acts of negligence as the platform owner.

Indeed, this court so held, in very similar situations, in *Wedlock v. Gulf Mississippi Marine Corp.,* 554 F.2d 240 (5th Cir.1977); and *St. Paul Fire & Marine Ins. Co. v. Vest Transportation Co.,* 666 F.2d 932 (5th Cir. 1982). For example, in *Wedlock* a barge owner (McDermott) chartered a tug boat (owned by DeFelice) to tow its barge, and was named as an additional assured in the marine P & I policy which covered DeFelice's tug boat. When a DeFelice employee was injured *while working on McDermott's barge,* McDermott contended—just as Chevron does in this case—that it was not liable for its negligence which caused the injury because it was named as an "additional assured" under DeFelice's policy. This contention was rejected:

"... DeFelice's policy covers McDermott's liability only 'as respects' the 'covered' vessel—here, the Miriam M. DeFelice. The Oceana 91 [McDermott's barge] was not listed as a 'covered vessel' under that policy. That is, the insurance policy does not purport to cover McDermott's liability for acts of negligence committed *qua* barge-owner, rather than *qua* charter.
"...
"... We find nothing in the insurance policy or the record to indicate that by insuring the tug DeFelice's insurers intended to insure against McDermott's negligence as a barge-owner." (554 F.2d at 242–43.)

In *Wedlock* this court also rejected the dicta in *Lanasse v. Travelers Ins. Co.,* 450 F.2d at 585, upon which Chevron relies in this case: *"Lanasse,* after all, emphasizes that Chevron could not recover from the insurer of the tug because Chevron's liability arose *qua* platform operator rather than *qua* shipowner (or charterer). Similarly, McDermott's liability arose as that of a barge owner, not as an owner or charterer of the covered vessel" (554 F.2d at 244). *See also Helaire v. Mobil Oil Co.,* 709 F.2d 1031 (5th Cir.1983) (the words "as owner of the vessel named herein" were deleted from the P & I policy so indemnification was "proper regardless of whether Mobil incurred liability as a 'vessel owner' or as a 'platform owner'"); and *Dow Chemical Co. v. TUG "THOMAS ALLEN,"* 349 F.Supp. 1354 (E.D.La.1972).

Although these cases involve marine P & I policies, the reasoning applies equally to a marine hull policy. Here, no liability has been imposed upon Chevron because of the operation of the SANDRA P. Indeed, the jury found that the SANDRA P was not unseaworthy and that neither its owner nor its crew were negligent. Instead, the liability imposed upon Chevron is because of its negligence as the offshore platform owner and operator which caused the explosion. Therefore, Chevron cannot escape this liability by claiming that it is an additional assured, and that subrogation rights have been waived, in the hull policy issued to cover the SANDRA P.

### Conclusion

Chevron's first issue, the denial of its motion for continuance, is based upon a misrepresentation of facts. Neither it nor Chevron's second issue, the alleged "statutory violation" by Offshore Painting, was presented to the trial court, so both issues are frivolous. Chevron's third issue is the same argument, based upon the identical indemnity provision, that Chevron lost before this court eight years ago. Chevron's final issue, which involves only the amount paid for the loss of the SANDRA P under a marine hull insurance policy, is without merit. Accordingly, we affirm all of the

judgments involved in these consolidated appeals.

AFFIRMED.