IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 01-10133

---

7-ELEVEN, INC. (f/k/a THE SOUTHLAND CORPORATION),

Plaintiff-Counter Defendant-Appellant

versus

NATIONAL UNION INSURANCE COMPANY OF PITTSBURGH, PA.,

Defendant-Counter Claimant-Appellee

Appeal from the United States District Court
for the Northern District of Texas
(3-00CV965-M)
February 28, 2002

Before DAVIS, WIENER, and BARKSDALE, Circuit Judges.

PER CURIAM[*]:

Plaintiff-Appellant 7-Eleven, Inc., formerly known as The Southland Corporation ("7-Eleven"), appeals the dismissal of its suit against Defendant-Appellee National Union Insurance Company ("National Union") for failure to state a claim. We conclude that the district court erred when it determined that an exclusion provision in the insurance policy underlying 7-Eleven's suit was unambiguous and barred coverage of 7-Eleven's claim, with the result that 7-Eleven had failed to state a claim for which relief could be granted. We therefore reverse the dismissal of 7-Eleven's

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

claim, and remand the case to the district court for further proceedings consistent with this opinion.

I. Facts and Proceedings

1. <u>The Franchise and Money Order Agreements</u>

7-Eleven is an operator and licensor of convenience stores. Although some of 7-Eleven's stores are company-operated, most are operated by franchisees. This case concerns the theft of nearly $2 million in American Express money orders by one former 7-Eleven franchisee, Feras Alfares.

Alfares operated three 7-Eleven stores in the Philadelphia area. 7-Eleven and Alfares entered into three detailed Store Franchise Agreements that governed their relationship with respect to the three stores operated by Alfares. The Store Franchise Agreements expressly provided:

> **21. Independent Contractor.** <u>FRANCHISEE shall be an independent contractor</u> and shall control the manner and means of the operation of the Store and exercise complete control over and responsibility for all labor relations and the conduct of FRANCHISEE's agents and employees, including, but not limited to, the day-to-day operations of the Store and all Store employees. <u>FRANCHISEE and FRANCHISEE's agents and employees shall not (i) be considered or held out to be agents or employees of 7-ELEVEN</u> or (ii) negotiate or enter any agreement or incur any liability in the name or on behalf of, or that purports to bind, 7-ELEVEN. <u>No actions taken by FRANCHISEE or FRANCHISEE's agents or employees shall be deemed to be actions obligating 7-ELEVEN. FRANCHISEE acknowledges that nothing herein shall create a fiduciary or similar relationship with 7-ELEVEN</u>. [Emphasis ours.]

In 1983, 7-Eleven entered into an agreement with American Express ("Amex") through which Amex money orders could be sold at

2

7-Eleven stores.  That agreement was memorialized in the Money Order Trust Agreement and includes the following noteworthy provisions:

>  **2. Trust Relationship.**
>  a.    Effective on Start Date, Amex appoints Seller [7-Eleven] as its Agent and Trustee authorized to sell Money Orders in accordance with the provisions stated herein.  Upon the Effective Date of this Agreement, and pursuant to its terms and conditions, Seller shall be a trustee and act in a fiduciary capacity with respect to any Money Orders and Trust Funds in Seller's possession.
>  b.    Seller agrees to hold the Money Orders and Trust Funds in trust for the benefit of Amex....  Except as set forth herein, <u>it is expressly understood that Seller does not by operation of this Agreement or otherwise acquire any right, title or interest of any kind in the Money Orders or Trust Funds.  All Money Orders and Trust Funds remain the sole and exclusive property of Amex.</u>
>  ...
>  **4. Remittance and Reporting Procedures.**
>  a.    Seller shall pay Amex the Amex Fee in the amount of $0.13, for each Money Order sold or used by Seller <u>or Participating Franchisees</u>.
>  ...
>  **6. Safekeeping and Liability for Loss.**
>  a.    ... <u>As used in this Section 6, the term "Seller" shall mean and include</u> any officer, employee, representative, <u>Participating Franchisee(s)</u> or agent of Seller.
>  b.    <u>Seller shall be absolutely liable to Amex for the Face Value of any Money Orders in all circumstances where such Money Orders are lost, stolen, misappropriated, seized or forfeited from Seller and subsequently paid by Amex.</u> [Emphasis ours.]

Amex entered into a separate agreement directly with Alfares. In that agreement, Alfares was appointed Amex's "agent authorized to sell American Express Money Orders."  As did the agreement

3

between Amex and 7-Eleven, Amex's agreement with Alfares emphasized that

> (c)  It is expressly understood that [Alfares] does not, by operation of this Agreement, acquire any right, title or equitable interest in the Money Order or the proceeds.

Finally, the contractual relationship between Alfares and 7-Eleven was updated to cover this new class of transactions in an agreement titled the Money Order Amendment.  In the Money Order Amendment, the parties agreed that Alfares, acting "as an independent contractor," would "use [his] best efforts in the promotion and sale of Money Orders," report all daily proceeds from the sale of money orders and deposit the daily proceeds from the sale of money orders as directed by the agreement, paying 14 ½ cents per money order to 7-Eleven as consideration for the money orders themselves and all the related services and material that 7-Eleven agreed to provide to Alfares.

Alfares began selling Amex money orders from his three 7-Eleven stores in 1995, and continued to do so without incident until 1999.  In 1999, however, he began to steal the money orders by either (1) issuing them to fictitious payees or (2) fraudulently signing money orders that were issued to legitimate payees and depositing the proceeds in his personal accounts or using them for his personal benefit.  By April 1999, Alfares had stolen $1,916,095 in this manner.  Alfares is thought to have left the United States and is a fugitive from justice.

4

2. The CrimeGuard Insurance Policy

To protect itself from losses arising from criminal activities, 7-Eleven had purchased a series of annual "CrimeGuard" insurance policies from National Union, effective for one-year terms that ran from November to November. The policies provided broad coverage for "losses" that met the definition of being "the direct deprivation of [7-Eleven] by a single act or a series of related acts resulting from dishonesty, dissolution, or forgery occurring during the Policy Period and reported to [National Union] during the Policy Period." For purposes of this definition, the terms "dishonesty" and "dissolution" are defined as well: "Dishonesty" is theft by an employee of the policy holder; "dissolution" is the destruction or disappearance of money or securities,[1] or theft by any natural person other than an employee.

When 7-Eleven discovered Alfares's theft of almost $2 million in Amex money orders, it notified National Union of its "loss" during the 1998-1999 policy term. Initially, National Union denied coverage on the ground that 7-Eleven lacked the "requisite financial interest" in the Amex money orders, but later changed its ground for denial of coverage, proffering two exclusions in the CrimeGuard policy, Exclusion "e" and Exclusion "l," as bars to coverage.

When National Union persisted in its refusal to cover 7-

---

[1] The parties do not dispute that the Amex money orders are "money" within the meaning of the CrimeGuard policy.

Eleven's losses resulting from Alfares's defalcations, 7-Eleven brought this action in the district court for the Northern District of Texas, alleging breach of contract and violation of the Texas Insurance Code. The district court granted National Union's Rule 12(b)(6) motion to dismiss for failure to state a claim. In its conclusional Order and Final Judgment, the district court stated:

> After considering the Motion, all responsive papers on file, the evidence presented by the parties and the arguments of counsel, the Court has determined that National Union's Motion to Dismiss should be granted based upon the application of Exclusion "e" in "the Policy." The Motion is denied with respect to the application of Exclusion "l." The Court further determines that because of the application of Exclusion "e," Plaintiff, 7-Eleven[,] will never be able to state any claim on the facts and occurrences set out in its complaint so that leave to amend would be futile.

The action was dismissed with prejudice, and 7-Eleven timely appealed.

II. Analysis

A. Standard of Review

We review de novo the district court's dismissal of an action for failure to state a claim. In doing so, we accept the plaintiff's factual allegations as true and will not affirm a Rule 12(b)(6) dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

6

would entitle him to relief."[2]

Interpretation of unambiguous contract provisions and determination whether a contract provision is ambiguous are questions of law which we also review <u>de novo</u>.[3]

B. <u>Discussion</u>

The parties do not dispute that Texas law applies in this diversity case. With respect to insurance policy construction, the Texas Supreme Court has offered the following guidance:

> First, insurance contracts are subject to the same rules of construction as other contracts. Our primary goal, therefore, is to give effect to the written expression of the parties' intent. We must read all parts of the contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative. <u>While parol evidence of the parties' intent is not admissible to create an ambiguity</u>, the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists.
> If, after applying these rules, a contract is subject to two or more reasonable interpretations, it is ambiguous. <u>Where an ambiguity involves an exclusionary provision of an insurance policy, we "must adopt the construction...urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable</u> or a more accurate reflection of the parties' intent."[4]

---

[2] <u>Blackburn v. City of Marshall</u>, 42 F.3d 925, 931 (5th Cir. 1995) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).

[3] <u>Stinnett v. Colorado Interstate Gas Co.</u>, 227 F.3d 247, 254 (5th Cir. 2000); <u>Mid Century Insurance Co. of Texas v. Lindsey</u>, 942 S.W.2d 140, 142 (Tex. App. —— Texarkana 1997).

[4] <u>Balandran v. Safeco Insurance Co. of America</u>, 972 S.W.2d 738, 740-41 (Tex. 1998) (quoting <u>National Union Fire Insurance Co. v. Hudson Energy Co.</u>, 811 S.W.2d 552, 555 (Tex. 1991)) (internal citations omitted) (emphasis added).

With these rules of construction in mind, we now analyze the CrimeGuard policy's exclusionary provisions at issue.

As explained above, the CrimeGuard policy covers "losses" resulting from a "dissolution." Alfares's theft of the Amex money orders will be covered by the policy absent any express provision to the contrary, because Alfares is an independent contractor, not a 7-Eleven employee: his theft of the money orders was therefore a "deprivation" resulting from "dissolution." National Union maintains that two separate exclusion provisions, Exclusion "e" and Exclusion "l," apply to bar coverage of 7-Eleven's losses. We conclude that, for Rule 12(b)(6) purposes, the district court erred when it determined that Exclusion "e" barred coverage, but we agree with the district court's conclusion that Exclusion "l" does not bar coverage. Because neither exclusion unambiguously bars coverage, 7-Eleven has not failed to state a claim for which relief may be granted.

1. Exclusion "e"

Exclusion "e" states that the CrimeGuard policy does not cover "loss or damage resulting from dissolution arising out of the giving or surrendering of assets in any exchange or purchase." None contest that 7-Eleven's loss resulted from a dissolution — a theft committed by a non-employee (Alfares). The parties disagree, however, about whether the dissolution can be said to have arisen out of the giving or surrendering of assets "in any exchange or purchase." The policy itself does not define these terms. 7-

8

Eleven contends that we should construe the terms "exchange or purchase" as referring to a transaction in which title to an asset is transferred in exchange for (1) money (a purchase) or (2) other property (an exchange).

In support of its position, 7-Eleven points to the common usage of these terms, particularly the definitions given in <u>Black's Law Dictionary</u>. 7-Eleven argues further that, because both the Money Order Agreement between Amex and 7-Eleven and the Money Order Amendment between 7-Eleven and Alfares emphasize that neither 7-Eleven nor Alfares would <u>acquire</u> <u>title</u> to the money orders, 7-Eleven's entrusting custody of the money orders to Alfares could not have been exchanges or purchases within the contemplation of Exclusion "e." Thus, reasons 7-Eleven, the dissolution cannot be said to have arisen out of the giving or surrendering of assets "in any exchange or purchase."

National Union first counters by emphasizing that Exclusion "e" refers to <u>any</u> exchange or purchase, and that there was an exchange sufficient to bring the transaction within the exclusion by virtue of the exchange of the money orders for the sales services provided by Alfares and the fees he was obligated to pay after each sale. National Union urges further that because the agreement between Amex and 7-Eleven is entitled "Money Order Trust Agreement" and creates a "trust relationship" between the parties, 7-Eleven did in fact — under basic principles of Texas trust law — acquire legal title to the money orders, which it held for the

benefit of Amex.

For Rule 12(b)(6) purposes, National Union's construction of this exclusion is not reasonable; on the contrary, we agree with 7-Eleven that there was no "exchange or purchase" (as those terms are normally used conjointly) of the money orders. We must, therefore, reverse the district court's dismissal of 7-Eleven's claim insofar as that Rule 12(b)(6) ruling is premised on a holding that Exclusion "e" prevents 7-Eleven's recovery under the CrimeGuard policy.

2. <u>Exclusion "l"</u>

As noted, the district court determined that, for purposes of Rule 12(b)(6), Exclusion "l" in the CrimeGuard policy does not preclude recovery. Exclusion "l" states that the policy does not cover

> [l]oss or damage resulting from dissolution of money or securities which benefits any natural person, partnership or corporation (other than the Insured's bank) acting in the capacity of a broker, factor, commission merchant, consignee, contractor or other agent or representative of the Insured <u>except any natural person, partnership or corporation who is duly authorized by the Insured to have custody of the money or securities.</u> [Emphasis ours.]

This provision, standing alone, would not bar coverage of 7-Eleven's loss from Alfares's dissolution, because he is a "natural person" who was "duly authorized" by the insured, 7-Eleven, "to have custody" of the money orders.

National Union contends, however, that the final clause of Exclusion "l," which restores coverage (negates exclusion of

10

coverage) for dissolution by the person duly authorized to have custody of the money or securities, was itself deleted by a separate document, titled "Endorsement #15," which reads in its entirety:

DESIGNATED AGENTS COVERAGE

It is agreed that:
Employee in the Definitions section is hereby amended by including the following:

1.  Employees of the following Agents, in their capacity as a Combined Distribution Center ["CDC"] are included as Employees of the Insured [7-Eleven]
    1. AMR Global Logistics (CDC)
    2. Bussan Logistics, Inc. (CDC)
    3. Weber Distribution Systems (CDC)
    4. Constance Foods Group (CDC)
    5. E.A. Sween Company (CDC)
    6. SIG Logistics, Inc. (CDC)

2.  It is hereby understood and agreed that Exclusion l is deleted in its entirety and replaced by the following:

    1.  loss or damage resulting from dissolution of money or securities which benefits any natural person, partnership or corporation (other than the Insured's bank) acting in the capacity of a broker, factor, commission merchant, consignee, contractor or other agent or representative of the Insured.

3.  As respects the aforementioned Agents, the following separate Limit of Liability is provided: $2,500,000.00

4.  As respects the aforementioned Agents, the following separate Deductible is provided: $1,000,000.00

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED. [Emphasis added.]

11

Section 2 above is obviously the problematic provision. Read in a vacuum —— which is precisely how National Union contends it should be read —— its effect would be to delete from the entire insurance policy the phrase that otherwise saves Alfares's theft from Exclusion "l," namely, "except any natural person, partnership or corporation who is duly authorized by the Insured to have custody of the money or securities." But, as with any other contract, single provisions cannot be construed alone and out of context.

We cannot, therefore, approbate such a fractured reading of Endorsement #15, which ignores the context in which section 2 appears, as National Union proposes. First, the Endorsement itself is titled "Designated Agents Coverage," strongly suggesting that the Endorsement will address only that subject. Second —— and more telling —— the entire substantive content of Endorsement #15 is preceded, and restricted, by the words, "Employee in the Definitions section is hereby amended by including the following:". Like the title of the Endorsement, this signal tells all who have occasion to read Endorsement #15 that <u>everything</u> following the colon will deal exclusively with the definition of the term "employee." Third, section 1 begins this task by informing the reader that the definition of Employee will be amended only to the extent that employees of six nominate CDCs are concerned: Employees of the listed CDCs will, for purposes of the policy, be treated as employees of 7-Eleven ("deemed 7-Eleven employee").

A continuing analysis of the provisions surrounding the

12

problematic section 2 reflects that the sections following it (sections 3 and 4) are unambiguous. Their effects are unquestionably limited to the CDCs listed in section 1. Construing Endorsement #15 as a whole, then, we conclude that in context, section 2 is most properly understood as limited in its applicability, as well. Section 2 is, in fact, a bewildering provision, but we need not occupy ourselves with solving its precise meaning, because one thing is clear: Section 2 somehow affects the CrimeGuard policy's coverage <u>only</u> when an employee or a named CDC is involved. Alfares was neither an employee of 7-Eleven nor connected in any way with one or more of the named CDCs. Whatever else the effects of section 2 may be, they cannot be tortured to reach the <u>dissolution</u> of Amex money orders by Alfares.

National Union appears to insist that the parties simply "stuck" a broad, generally-applicable section 2 right in the middle of the otherwise-restricted Endorsement #15, instead of bothering to create a separate document drastically reducing the policy's coverage, thereby excluding Alfares's dissolution from coverage. Even if there were somehow merit to this suggestion, National Union would be faced with a contractual provision that, when "read in light of the surrounding circumstances" is undeniably "ambiguous."[5] If on the basis of no other legal analysis, 7-Eleven's success on this appeal is assured by that recognition.

---

[5] <u>Balandran</u>, 972 S.W.2d at 741.

13

As stated above, when we review a district court's dismissal of an action for failure to state a claim, our focus is narrow indeed:  We need only ascertain whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[6]  When we here conclude that at least one reasonable construction of the ambiguous Endorsement #15 would not bar 7-Eleven's claim under the CrimeGuard policy, our task is complete:  We agree with the district court that Exclusion "l" does not preclude 7-Eleven's recovery under the policy for the dissolution accomplished by ⸺ and benefiting ⸺ its independent contractor, Alfares, who had no connection with any of the six named CDCs and was not an actual employee of 7-Eleven. Therefore, with neither Exclusion "e" nor Exclusion "l" unambiguously barring coverage, 7-Eleven escapes dismissal of its action at the Rule 12(b)(6) stage and can proceed to the next phase of the litigation, whether that be further discovery, summary judgment, or trial.

Undaunted, National Union argues in the alternative that even if Endorsement #15 does not amend Exclusion "l" as it pertains to Alfares, 7-Eleven's claim would still be barred, by the indemnity provision in Exclusion "l."  The provision to which National Union refers explains that if

> ℂ     the Insured has a contract with the natural person,
> partnership or corporation covering such loss or

---

[6] <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

14

damage, or if

C      the natural person, partnership or corporation has any indemnity or insurance covering such loss or damage,

then [National Union's] liability for such loss or damage shall only be the excess over the amount of such contract, indemnity or insurance and [National Union] shall not be obligated to pay any amount for such loss or damage until the Insured has been paid under all such contracts, indemnities or insurance.

National Union argues that because (1) the Money Order Amendment between Alfares and 7-Eleven expressly requires that Alfares be charged for, inter alia, 7-Eleven's losses "which [are] the direct or indirect result of any breach of this Money Order Agreement," and (2) the Store Franchise Agreement provides that "Franchisee [Alfares] shall be responsible for and indemnify 7-Eleven from all losses, except those specifically the responsibility of or indemnified by 7-Eleven," 7-Eleven must recover its loss from Alfares, not from National Union.

7-Eleven answers this argument definitively: As National Union did not make this argument to the trial court, it cannot do so for the first time on appeal. Our precedent is solidly to that effect, so we shall not consider National Union's argument.[7] It suffices that we agree with the district court's conclusion that Exclusion "l" will not serve as the basis on which to dismiss 7-Eleven's action for failure to state a claim for which relief can

---

[7] See, e.g., Wiley v. Offshore Painting Contractors, Inc., 711 F.2d 602, 609 (5th Cir. 1983) (citing Shingleton v. Armor Velvet Corp., 621 F.2d 180, 183 (5th Cir.1980) and United States v. Silva, 611 F.2d 78, 80 (5th Cir.1980)).

15

be granted.

3. <u>Texas Insurance Code Claim</u>

In addition to its claims directly under the CrimeGuard policy, 7-Eleven also brought a claim against National Union for violation of the Texas Insurance Code. 7-Eleven's complaint alleges in part:

> More specifically, Defendant is guilty of the following unfair insurance practices, which have been and are producing causes of Plaintiff's damages:
> (vii)    The Defendant misrepresented the terms of the insurance policy, in violation of 28 Tex. Admin. Code §§ 21.3 and 21.203(1); and (23); and Texas Insurance Code Ann. art. 21.21-2, § 2(a)....

Article 21.21-2, § 2 of the Texas Insurance Code provides:

> (a)  No insurer doing business in this state under the authority, rules and regulations of this code shall engage in unfair claim settlement practices.
> (b)  Any of the following acts by an insurer shall constitute unfair claim settlement practices:
> (a)  Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages as issue....

After concluding that Exclusion "e" barred coverage of 7-Eleven's claims, the district court "ordered, adjudged and decreed that ... 7-Eleven, Inc.'s Complaint is dismissed with prejudice," without distinguishing between policy-based claims and Texas Insurance Code-based claims. Even if the policy did not actually cover 7-Eleven's losses, 7-Eleven is entitled to develop facts applicable to its misrepresentation claim. That is, 7-Eleven is entitled to show, if it can, that National Union represented that losses such as those resulting from Alfares's crime would be

16

covered under the CrimeGuard policy. We therefore reverse the district court's dismissal of 7-Eleven's Texas Insurance Code-based claims as well as the policy-based claims.

### III. Summary

For Rule 12(b)(6) purposes, Exclusion "e" of the CrimeGuard policy does not bar coverage of 7-Eleven's claims because 7-Eleven's loss did not result from dissolution arising out of the giving or surrendering of assets in an <u>exchange</u> or <u>purchase</u>, as those terms are normally used conjointly, as required to trigger Exclusion "e." We agree, moreover, with the district court that Exclusion "l" of the CrimeGuard policy does not bar coverage of 7-Eleven's claims, and we shall not consider the indemnity provision highlighted by National Union because this contention was not presented to the district court. Finally, 7-Eleven is entitled to develop its misrepresentation claims grounded in provisions of the Texas Insurance Code. We therefore reverse the district court's grant of National Union's Rule 12(b)(6) motion, and we remand the action to the district court for further proceedings consistent herewith.

REVERSED and REMANDED.