202 So.2d 396 (1967)
Edward M. CAGLE
v.
PLAYLAND AMUSEMENT INC., Edward Jacomet, United States Fidelity and Guaranty, and Southern Farm Bureau Casualty Company.
No. 2559.
Court of Appeal of Louisiana, Fourth Circuit.
July 17, 1967.
Rehearing Denied October 4, 1967.
*397 Dodd, Hirsch, Barker & Meunier, Wilfred H. Boudreaux and Harold J. Lamy, New Orleans, for plaintiff-appellee.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Breard Snellings, New Orleans, for United States Fidelity and Guaranty Co. and Playland Amusement, Inc., defendants-appellants.
Porteous & Johnson, John J. Hainkel, Jr., New Orleans, for Southern Farm Bureau Casualty Co., defendant-appellant.
Before McBRIDE, CHASEZ and HALL, JJ.
HALL, Judge.
Plaintiff filed suit for damages for personal injuries, consisting of a gunshot wound, arising from the accidental discharge of a revolver in the hands of Edward Jacomet, a security guard employed by Playland Amusements Inc., operators of an amusement park in the City of New Orleans commonly referred to as "Pontchatrain Beach". Situated within the area of the amusement park is a restaurant called the "Bali Hai", which is also operated by Playland Amusements Inc.
*398 The accident happened under unusual circumstances. The basic facts are undisputed and are briefly as follows. Plaintiff and his wife together with his wife's uncle, Mr. James L. Little, all of whom were residents of Mississippi, after vacationing a few days on the Gulf Coast, decided to come to New Orleans. They drove to New Orleans in a 1964 four-door Chevrolet automobile belonging to Mr. Little. Mr. Little was an elderly gentleman and all of the driving was done by Mrs. Cagle, plaintiff's wife. After arriving in New Orleans they drove out to Pontchatrain Beach intending to have dinner at the Bali Hai restaurant. They arrived at Pontchatrain Beach around 6 P.M. on December 30, 1964. None of them were familiar with the surroundings, although plaintiff had eaten at the restaurant some years before. They approached Pontchatrain Beach from Franklin Avenue and drove into the East Parking Lot which is the parking lot used by customers of the beach. The parking lot for the restaurant customers is the West Parking Lot. In short they drove into the wrong parking lot. The beach and all of the amusement concessions were closed at this time of the year and the parking lot was completely empty. When Mrs. Cagle brought the car to a stop, her husband, the plaintiff, got out and went to seek directions. After he left Mrs. Cagle and Mr. Little got out to stretch their legs. When they did they shut the doors of the car and almost simultaneously realized they had locked the car keys inside. About this time plaintiff, having found no one from whom he could ask directions, returned to the car and was apprised of the situation. One of the party then saw a taxicab parked in an adjoining lot and all three walked over to the cab and asked the driver to radio'phone a General Motors dealer for a duplicate key. The cab driver explained that no place would be open at that time but offered to help them himself. Thereupon they got in his taxicab and were driven around to their car. It was getting dark and the taxi driver parked his taxi so that its lights would shine on the Chevrolet. In order to gain entrance to the car so that the door could be unlocked, the taxi driver, Mr. Little and plaintiff each in turn endeavored to open the small vent window on the driver's side of the Chevrolet by gouging out its rubber seating with a small pen knife belonging to Mr. Little and with a finger nail file belonging to Mrs. Cagle. Their efforts met with no success and it became evident that the window would have to be broken in order to gain entrance. Plaintiff and the taxi driver went off searching for a rock or some other object with which to break the glass. Their search was unsuccessful but when they returned to the car they were accompanied by Edward Jacomet, a security guard employed by the Beach operators. Jacomet pulled his revolver, a .38 Smith & Wesson, and struck the window with it. The gun discharged and the bullet passed through plaintiff's abdomen.
Plaintiff brought suit against the following defendants in solido:
1) Edward Jacomet, alleging negligence on his part,
2) Playland Amusements Inc., employer of Jacomet, on the theory of respondeat superior,
3) United States Fidelity and Guaranty Company, alleged to be the liability insurer of Playland Amusements Inc.,
4) Southern Farm Bureau Casualty Insurance Company, liability insurer of the Little vehicle, on the theory that Jacomet was "using" the car with the permission of Mr. Little and therefore was an omnibus insured under the terms of the policy.
The case was tried before a jury and upon the conclusion of the trial nine interrogatories were submitted to the jury to be answered as a special verdict (LSA-C.C.P. Art. 1811). The interrogatories and *399 the jury's answers thereto constituting a special verdict are as follows:
1. WAS MR. EDWARD JACOMET NEGLIGENT? "YES"
2. IF YOU FIND THAT MR. EDWARD JACOMET WAS NEGLIGENT, DID HIS NEGLIGENCE PROXIMATELY CONTRIBUTE TO THE ACCIDENT AND INJURY TO MR. EDWARD CAGLE? "YES"
3. WAS MR. EDWARD CAGLE CONTRIBUTORILY NEGLIGENT? "NO"
4. DID MR. EDWARD CAGLE ASSUME THE RISK? "NO"
5. IF YOU FIND THAT MR. EDWARD CAGLE CONTRIBUTORILY NEGLIGENT, THEN DID IT PROXIMATELY CONTRIBUTE TO THE ACCIDENT AND TO HIS INJURY? "NO"
6. WAS MR. JACOMET, AT THE TIME OF THE ACCIDENT, ACTING WITHIN THE COURSE AND SCOPE OF HIS EMPLOYMENT AND INCIDENTAL TO THE FUNCTIONS FOR WHICH HE WAS EMPLOYED BY PLAYLAND AMUSEMENT, INC.? "YES"
7. WAS EDWARD JACOMET, IN ATTEMPTING TO BREAK THE VENT WINDOW IN THE AUTOMOBILE, USING THE CAR WITHIN THE PURVIEW OF THE AUTOMOBILE LIABILITY INSURANCE POLICY OF MR. JAMES L. LITTLE WITH SOUTHERN FARM BUREAU CASUALTY INSURANCE COMPANY? "YES"
8. IF YOUR ANSWER TO NO. 7 IS "YES", WAS EDWARD JACOMET USING THE SAID CAR WITH PERMISSION, EITHER EXPRESS OR IMPLIED? "YES"
9. WHAT IS YOUR AWARD FOR ALL THE DAMAGES SUFFERED BY MR. EDWARD CAGLE? $20,000."
The Trial Judge entered a judgment on the verdict in favor of plaintiff and against all defendants in solido in the sum of $20,000.00 plus interest and costs; and fixed and taxed as costs the fees of the expert medical witnesses.
All defendants appealed except Edward Jacomet. Plaintiff answered the appeals praying that the amount of the judgment in his favor be increased to the sum of $35,000.00.
Each appellant assigns as error certain findings of the jury. Each of them also contends that the Trial Judge committed certain errors in the judgment rendered by him. None of the appellants however urges error in the first five findings of the jury, and the record fully supports the jury's finding that Jacomet was negligent; that his negligence was the proximate cause of the accident; that plaintiff was not contributorily negligent; and that plaintiff did not assume the risk of injury.
Playland Amusements Inc. and United States Fidelity and Guaranty Company who filed a joint appeal and a joint brief contend that the jury erred in finding that Jacomet, at the time of the accident, was acting within the course and scope of his employment and incidental to the functions for which he was employed by Playland Amusements Inc. They also contend that the jury's award of $20,000.00 for damages suffered by plaintiff is excessive.
Southern Farm Bureau Casualty Insurance Company contends that the jury erred in finding that Jacomet, in attempting to break the vent window in the automobile was "using" the car within the purview of the automobile liability policy issued to Mr. Little by Southern Farm Bureau Insurance *400 Company. This insurance company further contends that the jury erred in finding that Jacomet had "permission" to use the Little vehicle, and also contends that the jury's award of $20,000.00 is excessive.
We shall first dispose of appellants' assignments of error to the findings of the jury before discussing their objections to the judgment as rendered.

-1-
Did the jury err in finding by a vote of 9 to 3 that Jacomet, at the time of the accident, was acting within the course and scope of his employment with Playland Amusements Inc.?
Playland Amusements Inc. and United States Fidelity and Guaranty Company contend that although Jacomet was employed as a security guard by Playland his duties were limited to patrolling the fenced inner area of the amusement park, that his responsibilities did not extend to the parking lot, that he was not authorized to wear a pistol at the time of the accident and that in seeking to break the window he was not acting within the course and scope of his employment but merely acting as a good samaritan independently of his duties for Playland.
Two witnesses testified concerning Jacomet's duties, namely Jacomet and Harold G. Gerhardt, the supervisor or chief of Playland's security guard. Jacomet at first testified that his duties were limited to patrolling the fenced interior area of the amusement park. However on cross examination, when confronted with testimony he had given in a deposition taken prior to trial, Jacomet admitted that his duties as security guard included more than merely patrolling the inner beach area. He further admitted that his duties included investigating anything suspicious occurring in the parking lot and testified that on the occasion in question he unlocked the gate and went into the lot because he "* * * wanted to find out what they were doing out there * * * They seemed suspicious out there; they are not supposed to be in that parking lot. The Bali Hai, if they were at the Bali Hai, they'd be at the other parking lot, the west parking lot * * *" He further testified that when he had worked as a day time guard during the preceding summer part of his duties had been to prevent fights in the parking lot, to stop vandalism out there and to give directions to people and assist them in parking; that when he went on night duty during the winter he received no instructions to continue to perform these duties but was not told not to, and repeated that he went out there to see what the people were doing in the empty parking lot because if they were going to the Bali Hai they were in the wrong lot.
Mr. Gerhardt testified that he began his employment as Playland's Chief Security Guard in June of 1964, replacing a Mr. Chopin. Although Mr. Gerhardt testified that at the time of the accident Jacomet's duties were confined to the interior area of the amusement park, and although he testified (contrary to Jacomet) that Jacomet had been instructed not to go outside the fence, he admitted that he had not instructed any guards as to their duties since all of that had been done before he became employed as Chief Security Guard. His predecessor, Mr. Chopin, was not called as a witness.
Playland Amusements Inc. and United States Fidelity and Casualty Company also contend that Jacomet violated his employer's instructions by carrying a .38 revolver and therefore was not acting within the scope of his employment when he used the pistol to break the window. The record reflects that Jacomet had worked as a day time guard in June of 1964 at which time all the guards were equipped with pistols and held police permits to carry them. Jacomet's employment was terminated at the end of June and his police permit was surrendered. He was later rehired but when he was hired the second time the security guards had stopped using pistols *401 and were equipped with billies. Jacomet testified on direct examination that when he was rehired Mr. Gerhardt instructed him not to wear a pistol. However on cross examination Jacomet testified: "I wasn't instructed not to wear the gun." Mr. Gerhardt testified that he told Jacomet that he wasn't supposed to wear a gun because he had no police permit.
The gun in question had been left in the guards' locker room together with a holster, gun belt, and cartridge belt and Jacomet had free access to it. On the night of the accident Jacomet took the gun, holster and cartridge belt from the guard room and wore it on his rounds. He had misplaced his billy that night but would not testify that that was his reason for wearing the gun. He said in effect that he wore it simply "on a hunch."
The jury saw and heard the witnesses and in view of the testimony we are of the opinion that there was ample evidence to support their finding that Jacomet was acting within the scope and course of his employment at the time of the accident and that his duties as the lone security guard on duty on December 30, 1964 included not only the patrolling of the inner area, but also the investigation of any suspicious activity in the parking lot and to take those steps which would be in furtherance of his employer's interests which would include rendering assistance to the potential patrons of the Bali Hai restaurant. We find no manifest error in the jury's finding in this respect. See Bordelon v. Great American Indemnity Company, La.App., 124 So. 2d 634; Smith v. Foucha, La.App., 172 So. 2d 318; Hardware Dealers Mutual Fire Insurance Company v. Willis, La.App., 179 So.2d 441.

-2-
Did the jury err in finding by a vote of 10 to 2 that Jacomet in attempting to break the vent window was "using" the car within the purview of Mr. Little's liability insurance policy with Southern Farm Bureau Casualty Insurance Company?
Under the insuring agreements of the policy in question the insurer is obligated to pay for damage "* * * arising out of * * * use of the automobile * * *". In Bolton v. North River Insurance Company, 102 So.2d 544 (certiorari denied June 27, 1958) it was held that such clauses in an insurance policy are to be liberally interpreted and that a passenger in the back seat of an automobile who closed the door on the hand of a person standing outside the automobile was "using" the automobile.
Certainly if the act of closing a door is considered "use" of a car the act of opening a door must also be so considered and Jacomet in attempting to gain entrance to the locked car by breaking the vent window was using the car just as much as he would have been had he gained entrance by opening the door had it not been locked. Certainly gaining entrance to a car is a necessary incident to the use of the vehicle and therefore "arises out of" such use. While we are aware that there are some cases in other jurisdictions which set up certain tests for determining the insurer's liability in cases similar to the one presented here such as that the automobile itself must produce the injury or that the accident must occur within the territorial limits of the car, this Court in Speziale v. Kohnke, 194 So.2d 485 gave no countenance to such tests stating that "the words `arising out of use' provides its own test and simply requires a reasonable interpretation as to any given state of facts." We are of the opinion that as a matter of common sense the attempt in this case to gain entrance to the car by the only means available under the circumstances was an action arising out of the use of the car and the jury did not err in so finding.

-3-
Did the jury err in finding by unanimous vote that Edward Jacomet was using the car with the express or implied consent of Mr. Little the owner of the car?
We find no error in the jury's finding in this respect. The record shows *402 that Mr. Little wanted the window broken and so stated. Whether he made the statement to Jacomet or in his presence is a matter of some dispute, but after careful consideration of all of the testimony we are of the opinion that the jury had ample evidence upon which to base its finding. Before the arrival of Jacomet upon the scene Mr. Little himself as well as plaintiff and the cab driver had searched for some object with which to break the window.
Mr. Little testified with reference to Mr. Jacomet: "Well I figured he come to break the glass. He come back with Champagne and Cagle."
Mr. Little further testified as follows:
"Q. Now can you answer my question, sir? My question was, you did not have any objections to him breaking the glass? Can you give me a yes or no on that?
A. Well, I wanted the glass broke.
Q. The answer is yes, you had no objections to him breaking the glass?
A. I didn't have no objections to breaking it.
Q. You didn't care who broke it?
A. I would have broke it myself if I'd had something to hit it with.
Q. Well, your answer is you did not have any objections to this watchman or anyone else breaking that glass?
BY MR. HAINKEL:
Note an objection.
A. It didn't make no difference. I was wanting the glass broke.
BY MR. BOUDREAUX:
Q. Well, the answer isplease answer yes or no. Did you object to anyone breaking the glass?
A. No.

-4-
Was the award of $20,000.00 damages by unanimous vote of the fury excessive or inadequate?
Immediately following the accidental shooting of December 30, 1964 plaintiff was placed in the taxicab and rushed to Mercy Hospital where he came under the care of Dr. Raymond A. Schwarz, a specialist in General Surgery. Dr. Schwarz operated on plaintiff that night, the operation lasting 2½ hours. He found that the bullet had entered the left upper abdomen and had exited on the left side of the back penetrating the viscera in many places and causing a large amount of spilling of the intestinal content into the peritoneal cavity. Plaintiff lost approximately a pint of blood but fortunately no major arteries and no vital organs were injured. Plaintiff remained in the hospital for sixteen days under the care of Dr. Schwarz. During a portion of this time he had a drainage tube inserted in his stomach through his nostril. A cathether was also placed in his urinary tract through his penis, and he had two rubber drains in his wound. He was given massive doses of anti-biotics including penicillin and during his hospital stay he developed a penicillin rash over his entire body, and a very painful sore throat. Plaintiff was discharged from the hospital on January 15, 1965. He went home to Meridian in an ambulance on the recommendation of Dr. Schwarz. He remained at home partially bed ridden until March 15, 1965 when he returned to part time employment. On May 1, 1965, four months after the accident, plaintiff returned to full time employment.
After his discharge from the hospital plaintiff was seen by Dr. Schwarz on February 17, 1965, March 31, 1965, August 4, 1965 and February 10, 1966. His main complaints on each occasion were a feeling of weakness and nervousness, and a hesitancy in urination. He also complained of a pulling sensation at the site of the scar and low back pain. Dr. Schwarz discharged *403 plaintiff on February 10, 1966 and recommended the he see a urologist about his bladder trouble.
Plaintiff was still complaining of general weakness and of tiring easily when Dr. Schwarz last saw him which was over thirteen months after the accident. Dr. Schwarz stated that such complaints were compatible with plaintiff's accident and the surgery he went through, and when asked concerning any permanent residual disability that plaintiff might have percentagewise Dr. Schwarz testified:
"It's hard for me to give an estimate of what it would be. As I say, I think it is reasonable to feel that, as I say, a man his age would not have the resiliency, say, of a younger man, in recuperating from this operation, and I don't doubt that he does feel this weakness and, as he indicates, he doesn't feel quite the man he was before, and I would say as an estimate, in all fairness, trying to be fair with it, I would say probably between fifteen and twenty-five per cent. I would say that it is safe to say that he is not quite the man he was before if he's incapable of, you know, doing the same job that he did before, which he indicates he isn't."
Dr. Robert F. Sharp, a specialist in the field of urology, examined plaintiff on March 10, 1966. He found that plaintiff's urinary difficulties were due to a weak bladder and some prostitis but testified that it was difficult to relate the bladder weakness to the gunshot wound or the subsequent surgery, but that he thought plaintiff's prostitis "was in some way related" thereto.
Dr. Edward T. Haslam, an orthopedist, examined plaintiff on March 10, 1966. He found his abdominal scar well healed but slightly tender in the mid-section. He found no true hernia but did find some bulging alongside the scar when plaintiff strained. However Dr. Haslam found that plaintiff's low back pain and muscle spasm on bending to the left was due to osteoarthritis and was unconnected with the accident.
Dr. Sam Nadler, an internist, examined plaintiff on May 24, 1966 on behalf of the defendants, Playland Amusements Inc. and its surety. Dr. Nadler found plaintiff organically sound and was of the opinion that plaintiff had made a complete recovery from the accident and subsequent surgery. He found no objective reason for plaintiff's fatigue or any organic reason therefor.
Plaintiff himself testified that although he went back to work on a full time basis on May 1, 1965, he has never been able to perform all of the work he was accustomed to doing before the accident. His chief complaints at the time of the trial (in June 1966) were of his urinary condition and of weakness, shakiness, and fatigue. He also complained of the bulge alongside his abdominal scar and of his inability to lift anything.
Our conclusion after a careful review of the testimony is that although the medical experts find nothing from an objective standpoint to account for his complaints of fatigue and general debility there was sufficient evidence from which the jury could find that plaintiff still suffers from the effects of his unfortunate accident and we, as did the Trial Judge, find no reason to modify the jury's award of $20,000.00, of which approximately $2,900.00 was for hospital and medical bills and special damages.

-5-
The judgment rendered by the Trial Court.
Based upon the special verdict of the jury the Trial Judge rendered judgment in plaintiff's favor against all defendants in solido. Motions for a new trial, re-argument or in the alternative for a remittitur were filed by all defendants except Jacomet and were denied. In addition thereto Playland Amusements Inc. and its insurer, United States Fidelity and Guaranty Company *404 filed a motion to correct the judgment so as to render Southern Farm Bureau Casualty Company primarily liable thereon and movers only secondarily liable. This motion was likewise denied by the Trial Judge.
Playland and its insurer urge that the Trial Court erred in failing to enter a judgment primarily against Southern Farm Bureau Casualty Company. Southern Farm Bureau Casualty Company urges that the Trial Court erred in not prorating the amount of the judgment based on the proration clauses contained in the respective insurance policies.
In denying the motion to correct the judgment filed by Playland and its insurer the Trial Judge pointed out in his written "Reasons for Judgment" that no third party demand against Southern Farm had been filed by movers; and that the question of Southern Farm's primary liability was not presented to the jury nor was that of Playland's possible individual negligence. He went on to say:
"It is the opinion of the Court that the motion for a corrected judgment should be denied. The issue of Southern Farm's primary liability was not sufficiently raised in the pleadings * * * The interrogatories propounded to the jury were acquiesced in by all counsel and no attempt was made to present the question of Southern Farm's primary liability or Playland's independent negligence to the jury. The position of Southern Farm is well taken that they have the opportunity to defend against the claim of Playland, Inc. and its insurer for indemnity."
We are of the opinion that each of the defendants is liable to plaintiff for the full amount of the judgment plus interest and costs. We are of the further opinion, as was the Trial Judge, that the question of the ultimate distribution of the liability among the defendants was not sufficiently raised in the pleadings to warrant a correction of the judgment. This question however is not foreclosed but may be determined in future proceedings. (See LSA-C.C.P. Art. 1113)
For the foregoing reasons the judgment appealed from is affirmed; costs of this appeal to be borne in equal proportions by the respective appellants.
Affirmed.