**MID CENTURY INSURANCE COMPANY OF TEXAS, Appellant,**

v.

**Richard LINDSEY, Appellee.**

No. 06–96–00055–CV.

Court of Appeals of Texas, Texarkana.

Argued Feb. 6, 1997.

Decided March 13, 1997.

Rehearing Overruled April 2, 1997.

---

James E. Hughes, Merriman, Patterson, Allison, Longview, for appellant.

Robert D. Bennett, Terri W. Griffith, Griffith & Bennett, Gilmer, for appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

ROSS, Justice.

Mid Century Insurance Company appeals from a summary judgment entered in favor of Richard Lindsey, the plaintiff-appellee. The trial court found that the appellant breached its insurance contract covering the appellee when it failed to pay amounts due under an underinsured motorist provision. The court awarded the appellee $50,000.00, equaling the appellant's liability limit. The appellant brings one point of error, contending that the court erred by denying its motion for summary judgment and entering judgment for the appellee. We overrule this contention and affirm the judgment.

There is no dispute about the facts of the case. The appellant set out many of the facts in its own motion for summary judgment and response to the appellee's motion for partial summary judgment:

On January 19, 1992, Plaintiffs were seated in a vehicle owned by C.A. (Carol) Lindsey, Plaintiff Richard Lindsey's mother, and insured by Defendant with UM/UIM coverage. Richard Lindsey was seated in the driver's seat. The automobile had been driven to and parked at the spillway located at Lake O' the Pines. A Ford Ranger truck owned by Richard Glenn Metzer was parked in the parking space immediately to the left of the Lindsey vehicle. Mr. Metzer's nine year old son attempted to enter the truck through the truck's sliding rear window. While doing so, the Metzer child accidentally contacted a loaded shot-gun located on a gun rack positioned over the rear window of the truck, causing the gun to discharge. A portion of the buckshot entered the Lindsey vehicle and struck Richard Lindsey in the head, causing injuries. Special damages to Richard Lindsey exceed policy limits purchased by Richard Glenn Metzer for his vehicle.

The appellant has judicially admitted these facts, thereby relieving the appellee of the burden of proving them. *Mendoza v. Fidelity and Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex.1980). Additionally, a police report was attached to the appellee's motion for partial summary judgment. The police report indicates that the Metzers were fishing at the Lake O' the Pines spillway at the time of the incident. Their son returned to the truck because he was cold and wanted to retrieve his coveralls. The truck was locked, so the boy tried to crawl in through the back window, causing the shotgun to discharge.

The insurance policy in question provided: We will pay damages which a **covered person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of bodily injury sustained by a **covered person,** or **property damage,** caused by an accident. The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **uninsured motor vehicle.**

The policy included "underinsured motor vehicle" in its definition of "uninsured motor vehicle."

The appellant refused coverage for the shooting incident. The appellee and his wife filed suit against the appellant, seeking to recover damages for breach of contract, breach of warranty, violation of the Deceptive Trade Practices Act, violation of various provisions of the Texas Insurance Code, and breach of the duty of good faith and fair dealing. On May 25, 1995, the appellee filed a motion for partial summary judgment on the breach of contract claim. The appellant responded with its own motion for summary judgment. The court denied both motions. The appellee moved for rehearing of its motion and filed a supplemental motion for partial summary judgment, incorporating the previous motion for partial summary judgment. The court then granted partial summary judgment for the appellee on the breach of contract claim. A few months later, the court severed the breach of contract claim, making it the subject of a separate action.

A party is entitled to summary judgment if there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). Because there is no genuine issue as to any material fact, the court must determine whether either party was entitled to judgment as a matter of law.

An insurance policy is construed like any other contract. *National Union Fire Ins. Co. v. CBI Indus.,* 907 S.W.2d 517, 520 (Tex. 1995). The trial court must determine as a matter of law whether the contract is ambiguous. *Id.* If the contract is unambiguous, then the trial court must construe it as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). The court of appeals will review *de novo* the trial court's legal determinations. *Capitan Enters., Inc. v. Jackson,* 903 S.W.2d 772, 775 (Tex.App.-El Paso 1994, writ denied).

■ Neither party argues that the contract is ambiguous. However, the appellant requests that we reverse and remand the case, if we do not reverse and render. Such an action would be justified if (1) we decided

that the appellee did not present sufficient facts for the trial court to determine whether the incident was covered by the contract, (2) we decided that the appellee did not present sufficient facts for the trial court to determine whether the contract was latently ambiguous, or (3) we determined that the contract was ambiguous. "[W]ords cannot be said to be ambiguous unless their signification seems doubtful and uncertain to persons of competent skill and knowledge to understand them." BLACK'S LAW DICTIONARY 80 (6th ed.1990). A contract is not rendered ambiguous simply because the parties do not agree on its proper construction. *Pioneer Chlor Alkali Co. v. Royal Indem. Co.,* 879 S.W.2d 920, 935 (Tex.App.-Houston [14th Dist.] 1994, no writ); 17A AM.JUR.2D *Contracts* § 338 (1991). "[N]ot every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity. Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity." *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994). Although the parties disagree over the effect of the policy language, that language is susceptible to definite interpretation without resort to parol evidence; therefore, there will be no need to remand the case. In the absence of any relevant extrinsic evidence or an anticipation that such will be available, resolution of any ambiguity in a written contract is to be determined by the court as a matter of law. *Schuler–Haas Elec. Co. v. Aetna Casualty & Sur. Co.,* 40 N.Y.2d 883, 389 N.Y.S.2d 348, 357 N.E.2d 1003, 1003 (1976); 17A AM.JUR.2D *Contracts* § 339 (1991).

The appellant makes three arguments: (1) an unintentional gunshot wound is not an accident within the meaning of the uninsured/underinsured motorist provisions of the insurance policy; (2) the appellee's gunshot injuries did not arise out of the ownership, maintenance, or use of an uninsured or underinsured motor vehicle; and (3) to find coverage for an accidental gunshot wound only incidentally related to a motor vehicle would contravene public policy. We take each of these arguments in turn.

## I. "Accident"

■ The appellant argues that the shooting incident was not an "accident" covered by the policy. The appellant notes that the liability, liability limit, and personal-injury provisions of the policy use the phrases "motor vehicle accident," "auto accident," and "accident" interchangeably. The appellant also notes cases stating that Texas' uninsured/underinsured motorist statute is intended to effectuate insurance against damages caused by certain "automobile accidents." *Wright v. Rodney D. Young Ins. Agency*, 905 S.W.2d 293, 295 (Tex.App.-Fort Worth 1995, no writ); *Sikes v. Zuloaga*, 830 S.W.2d 752, 753 (Tex.App.-Austin 1992, no writ). The appellant therefore argues that a "motor vehicle," not a gun, must be the "instrumentality causing injury." However, this argument merely begs the question whether the accident arose from the use of an automobile.

■ The appellant also notes that in *Greene v. Great Am. Ins. Co.*, 516 S.W.2d 739, 743 (Tex.Civ.App.-Beaumont 1974, writ ref'd n.r.e.), the court stated in passing that "the premise [of uninsured motorist coverage] is to put the motorists injured in a collision with an uninsured vehicle in the same position that they would have been in had the other motorists been properly insured." The appellant therefore argues that there was no covered accident because there was no collision. However, the *Greene* court's statement was dicta. Neither the contract at issue nor the uninsured motorist statute limits accidents to collisions. In *Berry v. Dairyland County Mut. Ins. Co.*, 534 S.W.2d 428 (Tex.Civ.App.-Fort Worth 1976, no writ), an insurer contended that the term "motor vehicle accident" did not encompass injuries sustained while the insured alighted from his car. The court did not accept this argument:

> The policy sued on does not define 'motor vehicle accident.' There is no question but what a collision between two automobiles would be a motor vehicle accident. A collision between a car and a fixed or stationary object would also be a motor vehicle accident. And another reasonable construction of the meaning of that phrase as used in the policy would be an accidental injury sustained by a person while engaged in the use of or while occupying a motor vehicle. Because the phrase 'motor vehicle accident' can be construed as having more than one meaning, as we have demonstrated, it is our duty in deciding this case to give the phrase the construction that is most favorable to the insured.

*Id.* at 432–33.

There is one published case, uncited by the appellant, that strongly supports its position. In *State Farm Mut. Ins. Co. v. Peck*, 900 S.W.2d 910 (Tex.App.-Amarillo 1995, no writ), the court considered whether a dog bite in an automobile was an "auto accident." After first incorrectly stating that no Texas cases had defined the term "auto accident," the Amarillo court concluded that a dog bite cannot be an "auto accident." The court states that "the ordinary and generally accepted meaning of the term 'auto accident' refers to situations where one or more vehicles are involved in some type of collision or near collision with another vehicle, object, or person." *Id.* at 913. *Peck* was recently cited by the supreme court in *Farmers Texas County Mut. Ins. Co. v. Griffin*, No. 96–0898, 1997 WL 78574, at *2 (Tex. Feb.21, 1997), which concluded that a gunshot wound inflicted on a pedestrian by a passenger in a car was not an "auto accident."

■ *Griffin* and *Peck* focus upon the term "auto" in the phrase "auto accident." It was apparent in *Peck* that the incident in question was an "accident." Hundreds of cases around the nation concern accidents not involving a collision. Larry D. Scheafer, Annotation, *Automobile Liability Insurance: What Are Accidents or Injuries "Arising Out of Ownership, Maintenance, or Use" of Insured Vehicle*, 15 A.L.R.4th 10 (1982). In fact, almost all the cases defining "accident" concern the effect of human volition upon the definition of an incident as an accident. *See* 12 Couch on Insurance 2d §§ 45:34–:41 (1981); E. LeFevre, Annotation, *What Loss of or Damage to Vehicle is Accidental Within Coverage of Collision Policy*, 57 A.L.R.2d 1229 (1958). An accident, when viewed from the standpoint of a victim, is an unexpected happening without intent or design. 12

COUCH ON INSURANCE 2D § 45:34. Regardless, *Peck* relies almost exclusively on *Farmers Ins. Co. v. Grelis,* 43 Wash.App. 475, 718 P.2d 812 (1986). The court in *Grelis* considered whether an unintentional stabbing of the insured was an "automobile accident" when it occurred during the course of a robbery of the insured in his car. The court notes:

> Neither party disputes the fact that Grelis's injuries were the result of an accident. . . . The definition of accident is easily met by the facts of this case. The issue here, however, is whether the word "accident" is ambiguous when modified by the word "automobile."

*Id.* at 813. The court concludes that although the incident was an "accident," it was not an "automobile accident."

Because there is no evidence that anybody expected or intended the firing of the shotgun, the incident in this case was an accident. Although the insurance policy in the present case occasionally uses the terms "auto accident" or "motor vehicle accident," the operative language of the uninsured/underinsured motorist provisions refers only to an "accident." Therefore, this case is distinguishable from *Peck, Griffin,* and *Grelis.*

Nevertheless, two Houston cases support the proposition that "accident" can be understood to mean "motor vehicle accident." In *Le v. Farmers Texas County Mut. Ins. Co.,* 936 S.W.2d 317 (Tex.App.-Houston [1st Dist.] 1996, n.w.h.), the court considered whether a personal injury protection automobile insurance policy providing coverage for all injuries resulting from a "motor vehicle accident" was repugnant to the statute requiring such coverage for an "accident." The court noted that the policy form had presumably been approved by the Board of Insurance Commissioners. For policy reasons, the court declined to question the Board's conclusion that the statutory term "accident" applies only to "motor vehicle accidents." *Id.* at 323–24. The court then adds this superfluous and unsupported dicta: "Within the context of automobile liability insurance, the legislature intended all types of coverage, including liability, uninsured motorist and personal injury protection, to be limited

to motor vehicle accident situations." *Id.* at 324. The court in *Schulz v. State Farm Mut. Auto. Ins. Co.,* 930 S.W.2d 872, 875 (Tex.App.-Houston [1st Dist.] 1996, n.w.h.), accepts the reasoning of *Le.*

The appellant has not provided any evidence that the legislature intended the uninsured/underinsured motorist provisions of the Insurance Code to apply only to accidents involving some sort of collision. *Le* and *Schulz* infer a legislative intent without much evidence thereof. "Terms used in an insurance contract are given their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense." *Security Mut. Casualty Co. v. Johnson,* 584 S.W.2d 703, 704 (Tex.1979). The courts in almost all cases have determined that an accident need not be a collision. Therefore, we reject the appellant's argument because it urges a meaning that is not generally accepted.

## II. "Arise Out of the Use"

■ A multitude of cases have considered whether various firearm accidents arise out of the "ownership, maintenance, or use" of an automobile. Because this case does not involve questions regarding the repair of Metzer's automobile, "maintenance" is not a relevant issue. 12 COUCH ON INSURANCE 2D § 45:63 (1981). "Ownership" is also not a relevant issue. The appellee urges the court to find that the accident arose out of the ownership of the vehicle, even if it did not arise out of the use. However, he does not point to any cases giving the term "ownership" such independent meaning. "The term 'use' is the general catchall of the insuring clause, designed and construed to include all proper uses of the vehicle not falling within other terms of definition such as ownership and maintenance." *State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co.,* 437 S.W.2d 542, 545 (Tex.1969). Therefore, we need only to consider whether the accident arose out of the use of the automobile.

"Arise out of the use" is a nebulous phrase which courts have consistently interpreted broadly. 12 COUCH ON INSURANCE 2D § 45:64 (1981) extensively discusses the meaning of "use":

When "use" is distinguished from "operation," it has been held that the former denotes the purpose for which the automobile was employed while the latter refers to its actual physical operation or manipulation of controls....

....

The term "use" has been broadly construed and it would appear to be a general catchall term not limited to the ordinary use of the automobile....

Any exercise of control over the vehicle constitutes a use, regardless of its purpose, extent, or duration....

....

One may "use" the vehicle while it is not in motion.

■ For an injury to arise out of a use, it does not need to be proximately caused by that use. *State Farm Mut. Auto. Ins. Co. v. Francis*, 669 S.W.2d 424, 427 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). Courts have applied at least six different tests for determining whether there is a causal connection between the use of an insured vehicle and an injury:

(1) The dangerous situation causing injury must have its source in the use of the automobile; (2) The chain of events resulting in the accident must originate in the use of the automobile and be unbroken by the intervention of any event which has no direct or substantial relation to the use of the vehicle; (3) The accident must be a natural and reasonable incident or consequence of the use of the vehicle for the purposes contemplated by the policy, although not necessarily foreseen or expected; (4) The accident must be one which can be "immediately identified" with the use of the automobile as contemplated by the parties to the policy; (5) The accident must be of a type reasonably associated with the use of the automobile as contemplated by the contracting parties; (6) The accident must be one which would not have happened "but for" the use of the automobile.

*Kohl v. Union Ins. Co.*, 731 P.2d 134, 136 n. 2 (Colo.1986).

Few Texas cases have discussed the meaning of "arise out of the use." Only two cases purport to set forth an overarching rule. The courts in *Collier v. Employers Nat'l Ins. Co.*, 861 S.W.2d 286, 289 (Tex.App.-Houston [14th Dist.] 1993, writ denied), and *Le*, 936 S.W.2d 317, adopt a somewhat restrictive test:

1. The accident must have arisen out of the inherent nature of the automobile, as such;
2. The accident must have arisen within the natural territorial limits of [the] automobile, and the actual use, loading, or unloading must not have terminated; and
3. The automobile must not merely contribute to the cause of the condition which produces the injury, but must itself produce the injury.

Although these general formulations shed light on the meaning of "arise out of the use," it is more helpful to view this case in light of concrete applications of the policy language in other similar cases. *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13, 15–16 (Mo.Ct.App.1980), is the most often cited case discussing whether firearms injuries arise from the use of an automobile. The court in *Cameron* analyzes relevant cases from all over the country and divides them into five categories:

One category of cases may be fittingly described as involving the accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle is handling or toying with the gun.... *Without exception*, these cases hold that no coverage exists under the insuring agreements of the respective automobile liability policies involved because there was no causal connection between the discharge of the guns and the use of the vehicles; at best, the vehicles were merely the "situs" or "locus" of any resultant injuries as discharge of the guns was unconnected with the inherent use of the vehicles.

A second category of cases may be fittingly described as involving the accidental discharge of guns during the process of loading them into or unloading them from vehicles.... Without exception, these

cases hold that coverage exists under the insuring agreements of the respective automobile liability policies involved by reason of coverage extended to the process of loading and unloading vehicles.

A third category of cases may be fittingly described as involving the use of a physical portion of a vehicle as a "gun rest" for the purpose of firing a weapon. [The cases are in disagreement on this category.]

A fourth category of cases may be fittingly described as involving the accidental discharge of guns resting in or being removed from gun racks permanently attached to vehicles.... These cases appear to pivot on the rationale that the presence of permanently attached gun racks in vehicles establishes a significant causal connection between the use of such vehicles and the accidental discharge of weapons carried therein, hence affording coverage under the insuring agreements of automobile liability insurance policies for any resultant injuries occasioned by the accidental discharge of such weapons while in or being removed from such permanently attached gun racks.

A fifth and final category of cases may be fittingly described as involving the accidental discharge of guns inside a vehicle caused by the actual movement or operation of the vehicle. [The courts found coverage in this situation.]

This case most closely resembles the fourth category of cases. At least five appellate cases discuss whether the accidental discharge of a firearm from a gun rack arises from the use of the automobile. Four of the cases have found coverage. Coverage was found in *Kohl,* 731 P.2d 134; *Quarles v. State Farm Mut. Auto. Ins. Co.,* 533 So.2d 809 (Fla.Dist.Ct.App.1988); *Reliance Ins. Co. v. Walker,* 33 N.C.App. 15, 234 S.E.2d 206 (1977); and *Transamerica Ins. Group v. United Pac. Ins. Co.,* 92 Wash.2d 21, 593 P.2d 156 (1979). Coverage was not found in *State Farm Mut. Auto. Ins. Co. v. Powell,* 227 Va. 492, 318 S.E.2d 393 (1984).

*Kohl* involved five people returning in three vehicles from a hunting trip. On the way back, the group stopped at a store for refreshments. The cars were parked, and everybody conversed for a while in the parking lot. Weaver, one of the members of the group, returned to his Jeep to retrieve a gasoline can. While there, Weaver decided to take his rifle from his gun rack in order to store it for the remainder of the return trip. As Weaver was removing the rifle, it discharged, killing a member of the party and injuring two others. Weaver's automobile insurance policy insured every person injured on account of the use of his vehicle. The injured parties and the estate of the deceased party filed claims against Weaver's carrier. The trial court denied recovery, the court of appeals affirmed, and the Colorado Supreme Court reversed. *Kohl,* 731 P.2d at 135.

The court first held that the transportation of a rifle for the purpose of hunting was a use covered by the policy. Such a use was not "foreign to [the] design" of the vehicle. Instead, the use could have been expected because a Jeep is designed to be used in rugged rural terrain and because Weaver had installed a gun rack on the Jeep. *Id.* at 136. Furthermore, the court concluded that:

> [T]he evidence is clear that the claimants' injuries were causally related to the use of Weaver's jeep.... Weaver's actions were intimately related to his use of the vehicle as transportation for himself and his rifle from a mountain hunting area to his home in Canon City.

*Id.* at 137.

In *Quarles,* the owner of a pickup truck attempted to unload a shotgun that was located in a permanently affixed gun rack. The shotgun discharged, killing Quarles, who was standing next to the truck talking to its owner. Quarles' parents sued their own insurer, seeking uninsured motorist benefits, and sued the truck owner's insurer. The trial court determined that there was no causal connection between the use of the vehicle and the accident and dismissed the complaint. *Quarles,* 533 So.2d at 812. The court of appeals reversed, holding that "[t]he presence of the permanently attached gun rack in [the] pickup truck established a significant causal connection between the use of the pickup truck and the accidental discharge

of the shotgun." The court also stated that "the transportation of firearms is an ordinary and customary use of a motor vehicle, especially pickup trucks." *Id.*

*Walker* also involved a pickup truck with a permanently affixed gun rack. The owner of the truck, Lewis, went on a hunting excursion, after which he placed his loaded rifle in the gun rack. He returned home in order to pick up others who were going to go on another hunting trip with him. As Walker was standing by the pickup, preparing to enter the cab, Lewis began to insert his keys into the ignition. At that moment, the rifle discharged, injuring Walker. Lewis' liability insurer instituted a declaratory judgment action to determine if it was obligated to compensate Walker under a clause obligating it to pay for injuries arising out of the use of the pickup truck. The trial court entered judgment finding coverage, and the court of appeals affirmed. *Walker*, 33 N.C.App. 15, 234 S.E.2d 206.

The court first discussed the meaning of "arise out of." It noted that the phrase is "broad, general, and comprehensive," but that it requires "a causal connection between the use and the injury." *Id.* at 210.

> This causal connection may be shown to be an injury which is the natural and reasonable incident or consequence of the use, though not foreseen or expected, but the injury cannot be said to arise out of the use of an automobile if it was directly caused by some independent act or intervening cause wholly disassociated from, independent of, and remote from the use of the automobile.

*Id.* at 210–11. Because the gun rack was permanently affixed and frequently used, "the transportation of guns was one of the uses to which the truck had been put." *Id.* at 211. The court concluded that "the shooting was a 'natural and reasonable incident or consequence of the use' of the truck and was not the result of something 'wholly disassociated from, independent of, and remote from' the truck's normal use." *Id.*

*Transamerica* involved two men who had been hunting for several days. They carried their rifles in a gun rack permanently affixed to the cab of a truck that belonged to the driver. At one point, the passenger informed the driver that he wanted to have his gun available in case he saw an elk. The driver stopped the truck. The passenger began to remove the gun from the rack, but as he did so, the trigger brushed against the rear bracket of the gun rack, causing the rifle to discharge and injure the driver. The passenger's home insurer defended the suit and paid a settlement. It then sued the driver's automobile liability insurer for reimbursement, claiming that the injury arose from the use of the truck. The trial court dismissed the claim, the court of appeals reversed, and the Washington Supreme Court affirmed. *Transamerica*, 593 P.2d at 157.

The court noted that:

> The cases concerning gunshot wounds received in and around automobiles place particular importance on some physical involvement of the vehicle itself or some permanently attached part thereof. Where such physical involvement was absent, the vehicle has been deemed the mere situs of the accident and thus the accident has been construed to fall outside the coverage of the policy.

*Id.* at 159. The court found physical involvement based on the trigger brushing against the gun rack; therefore, the court found liability.

Finally, there is *Powell*, in which the Virginia Supreme Court reversed a trial court judgment, concluding that a firearm injury did not arise from the use of the vehicle. Good drove his pickup truck, which had a permanently affixed gun rack holding a shotgun, to the park. There he met some friends, who stood around the truck talking to him. Suddenly, without anybody touching the gun and without any unusual movements, the gun fired, hitting and killing Powell, who was standing next to the truck. *Powell*, 318 S.E.2d at 394. Powell's personal representative sued Good, and State Farm, Good's automobile insurer, sought a declaratory judgment that its liability insurance provisions did not cover this incident.

The court noted that the truck was not sold with a place for installation of the rack.

The rack was installed later by the truck's owner. Therefore, the insurer could not be "charge[d] ... with notice" of the rack. *Id.* at 397. The court also concluded that "the truck merely was the situs for a social gathering. The vehicle was equivalent to a park bench, a picnic shelter, a tent, or a shed in that it was being employed as a gathering place for friends and not for any specific enterprise usually associated with use of a passenger, farm utility vehicle." *Id.* at 398.

The bulk of these cases holds that the transportation of a firearm is an ordinary use of a vehicle with a gun rack. In other words, "[i]t can be assumed to be reasonably within the contemplation of the parties to an insurance agreement that a car with a gun rack might be used to carry a gun." *Western Casualty and Sur. Co. v. Branon,* 463 F.Supp. 1208, 1210–11 (E.D.Ill.1979). It especially can be assumed to be within the contemplation of the parties that a pickup truck in Texas might be used to carry a gun.

■ Additionally, the present case is stronger than the others because this accident also was caused by a passenger's attempt to enter the vehicle. Injuries sustained by an individual trying to enter a vehicle arise out of the use of that vehicle. *See* 12 COUCH ON INSURANCE § 45:74 (1981); 7 AM.JUR.2D *Automobile Insurance* § 195 (1980). Very few cases discuss the situation we have here: injuries sustained by one individual caused by another individual's attempt to enter his vehicle. However, the reasoning is the same. If an attempt to enter a vehicle is a "use" of that vehicle, injuries arising from that "use" are covered. Admittedly, the child's method of entering the truck through the sliding rear window may have been unorthodox. However, we have no evidence before us as to whether that method of entry was customary or expected. Regardless, even unorthodox attempts to enter a vehicle may constitute "use" of the vehicle. For example, when the passengers lock themselves out of their car, a security guard "uses" the car when he attempts to help the passengers enter the car by breaking the window with his gun. Consequently, when the gun discharges, wounding a passenger, the injury arises from the use of the car.

*Cagle v. Playland Amusement Inc.,* 202 So.2d 396, 401 (La.Ct.App.1967).

Relevant Texas case law is extremely sparse. The appellant relies very heavily on *Collier,* 861 S.W.2d 286. Collier was injured by bullets fired from an unidentified passing car. He sued the company that insured the car he was driving, seeking to recover under an uninsured motorist provision nearly identical to the one in the instant case. The trial court granted summary judgment for the insurer, and the court of appeals affirmed. *Id.* at 288. The court of appeals reasoned that the attack did not arise out of the inherent nature of the automobile. "The same injury could have been suffered in the same way if the parties had been on foot, on bicycles, or in any other of a number of circumstances." *Id.* at 289. In contrast, in the instant case, the injury arose from the storage of a gun in a pickup that was equipped for the permanent storage of weapons. The *Collier* court also stated, "We doubt that the risk of bodily injury arising from a criminal assault is the type of risk that two parties to an automobile liability insurance contract normally contemplate." *Id.* Again, *Collier* is clearly distinguishable from our case: in *Collier,* the injury arguably was not even accidental. Finally, the court noted that the Texas Insurance Code mandates that an uninsured motorist policy only cover accidents caused by an unknown motorist when "actual physical contact" occurs between the uninsured vehicle and the covered vehicle. *See* TEX. INS.CODE ANN. art. 5.06–1(2)(d) (Vernon Supp.1997). The uninsured vehicle was never identified; therefore, there was no coverage because there was no physical contact between the two vehicles. In the instant case, the underinsured motorist was identified; therefore, physical contact was not required.

A recent Texas Supreme Court case, *National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.,* No. 96–0633, 1997 WL 71253 (Tex. Feb.21, 1997), discussed an insurer's duty to defend under a "resulting from the use" policy. The plaintiff alleged that the insured negligently discharged a firearm from his truck. Because the plaintiff did not allege any additional facts, the Texas

Supreme Court declined to find that coverage was triggered. The facts did not suggest a causal connection between the use of the automobile and the plaintiff's injury. The instant case is distinguishable. Many cases of negligent discharge-for example, those involving a passenger toying with a gun-do not arise from the use of the vehicle. If a court knows only that the discharge of a firearm was negligent, it cannot determine that a resultant injury arose from the use of a vehicle. In contrast, we are apprised of detailed facts describing a discharge that clearly arose from the use of the vehicle. Therefore, the appellant's reliance on *National Union* is misplaced.

*Le,* 936 S.W.2d 317, also involved an attempt by a victim of a drive-by shooting to recover under his uninsured motorist provision. The court in *Le* adopted the same reasoning as *Collier:* the accident arose from the use of the gun, not the car, and the Texas Insurance Code requires physical contact for recovery when the other driver is unidentified.

There is one old Texas case that bears mentioning. *Dorsey v. Fidelity Union Casualty Co.,* 52 S.W.2d 775, 775-76 (Tex.Civ. App.-Waco 1932, writ dism'd by agr.), is a case in which the court discussed a policy insuring against losses and liabilities resulting from bodily injuries "sustained only as the result of operating, driving, riding in or on ... an automobile." The insured was injured when a hunting companion's gun discharged as he was preparing to load it into the vehicle. *Id.* at 776. The trial court denied recovery on the policy, and the court of appeals reversed. The court held that the loading of guns into a car was a natural use of the car and that the injury therefore was the result of operating the car.

The instant case is not controlled directly by any Texas case. Therefore, we look to the weight of case law from other states. We find the reasoning of these cases persuasive, and it supports our finding of coverage in this case.

### III. Public Policy

The appellant last argues that if there is coverage in this situation, then there is coverage in all sorts of absurd situations (*e.g.,* the Oklahoma City bombing) and therefore "public policy" mandates toward denying coverage here. The appellant's concern with public policy is misplaced. If anything, the uninsured/underinsured motorist provision of the Insurance Code expresses a public policy in favor of protecting the insured. A "slippery slope" argument cannot deny coverage when coverage is warranted.

We affirm the judgment of the trial court.